## GLENS FALLS INDEMNITY CO. v. PALMETTO BANK.

### No. 4408.

Circuit Court of Appeals, Fourth Circuit.
June 12, 1939.

J. B. S. Lyles, of Columbia, S. C. (Cooper & Maher, of Columbia, S. C., on the brief), for appellant.

R. T. Wilson and R. E. Babb, both of Laurens, S. C. (Blackwell, Sullivan & Wilson, of Laurens, S. C., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and HARRY E. WATKINS, District Judge.

PARKER, Circuit Judge.

This is an appeal from a judgment in favor of defendant bank in an action instituted to recover the amount of the loss sustained by a cotton mill as the result of embezzlement by its secretary and assistant treasurer of the proceeds of checks cashed by the bank. Plaintiff in the court below was the Glens Falls Indemnity Company, surety on the fidelity bond of the secretary and assistant treasurer. Having paid the amount of the loss sustained by the mill as the result of the defalcation of this officer, it instituted suit against the bank on the theory that checks payable to the mill had been wrongfully paid by the bank to the officer resulting in the loss sustained by the mill. The principal contention of plaintiff is that verdict should have been directed in its behalf, as the facts are undisputed. They are as follows:

Both the bank and the cotton mill were located in the town of Laurens, S. C. The president and treasurer of the mill, one R. E. Henry, who was president also of a number of other mills, lived at Greenville, S. C., approximately 35 miles distant, and seldom came to Laurens. The business of the mill at Laurens was completely under the control and direction of C. S. Link, Jr., who was secretary and assistant treasurer. He had complete control over the books of the mill in its office, over the cash in the drawer, over the deposit and withdrawal of funds from the bank and generally over all business of the mill transacted at Laurens. Mr. Henry testified that he had nothing to do with keeping the books, making up the books or handling the cash, that he "delegated that full authority to Mr. Link", and that Mr. Link handled the funds of the mill at Laurens. The by laws of the mill provided that the assistant treasurer should act under the president

and treasurer "as a general assistant to that officer" and should have authority "to sign checks and drafts on any and all banks with whom the company may be doing business". The bank was furnished a signature card by the mill, showing the signature of Henry as president and treasurer and Link as secretary and assistant treasurer, as authorized signatures for the bank to recognize in the transaction of business. There was uncontradicted testimony by president Henry to the effect that Link had authority to indorse checks payable to the mill and get the money on them. All of the dealings by the bank with the mill were had with Link and not with Henry. The testimony bearing upon the authority of Link is accurately summarized by the learned judge below as follows: "The president and treasurer of the mill, in pursuance of the resolutions of the board of directors, delegated to Link the same authority that he had as president and treasurer of the mill. In answer to the question, 'You delegated the full authority you had to Link?' he answered, 'Yes, sir'. Link was authorized to receive cash paid to the mill from incidental sources; had the authority to pay and paid all employees and officers of the mill in cash each week; he had the custody of the petty cash which ranged from one thousand to fifteen hundred dollars, and on one occasion, due to the banking holiday, as much as fourteen thousand dollars; he opened and had full charge of the mail; he collected rents ranging from two to three thousand dollars per month; he was empowered to sell junk and scrap iron, and was given full authority to handle the financial affairs of the mill; and was empowered to contract debts and incur liabilities in behalf of the mill as he found it necessary to conduct the business of the same properly; he had custody of all books, records, deposit slips, checks and bank accounts; had authority to indorse checks payable to the mill and deposit the same to the credit of the mill, and for such purpose he used a rubber stamp containing the following words: 'For deposit account of Watts Mills, Laurens, S. C.—C. S. Link, Jr., Assistant Treasurer'; he had authority to cash checks properly indorsed; he had supervision of all bookkeepers and clerks; he signed all the checks of the mill except when he was sick or absent; practically all the dealings with the bank were done by Link, and the printed checks used in drawing on the mill's account were signed by Link over the printed words 'Assistant Treasurer'".

Between April 12, 1933, and June 6, 1936, Link embezzled funds of the mill in the sum of approximately $19,000. Of this amount $15,840.80 was obtained by cashing with the defendant bank at various times 46 checks drawn on other banks and payable to the mill. The embezzlements were concealed by an elaborate system of false entries which effectually deceived the auditors who made a quarterly audit of the books of the mill, and they were not discovered until after Link was discharged from his position in 1936. The checks upon which Link thus obtained cash were indorsed with the rubber stamp above referred to in the same manner as checks that were deposited. There is no evidence that the bank had any notice of Link's breach of trust or any reason to believe that he proposed to use the moneys received on the checks other than for the purposes of the mill. The collections of the checks were made over a period of three years; statements of account were regularly furnished the mill; and no protest was received as to any irregularity in the statements as furnished.

Under these circumstances we think not only that it was proper to deny plaintiff's motion for a directed verdict but also that verdict might properly have been directed for the defendant. There being no evidence that the bank had notice of any intended misappropriation by Link, the only question which arises is whether it was justified in dealing with him as representing the mill in cashing the checks. And we think that upon the evidence there can be no question as to this, whether consideration be had of the authority which Link was held out as possessing or only of his actual authority. He was vested with complete control over the mill's business at Laurens and with the handling of its funds. He was not, of course, authorized to convert the funds of the mill to his own use; but he was authorized to cash checks drawn to its order. A payment to him, therefore, of a check payable to the mill was payment to the mill itself; and the effect of the payment as a valid acquittance to the bank for the check cashed was not changed by the fact that he may subsequently have embezzled the proceeds.

If after Link had obtained cash on one of the checks here involved he had been robbed of it on the way to the mill

office, it would not occur to anyone that the bank could be held liable by the mill for the value of the check which it had cashed; but it must be apparent that liability in such case cannot depend upon the identity of the thief who steals the property. When Link cashed the checks he was acting within the scope of his authority as an officer of the mill. The fact that he subsequently exceeded his authority in embezzling the proceeds was no concern of the bank, in the absence of notice to it of his intention. The question was whether the bank was guilty of wrong or neglect in cashing the checks for him, not whether he was guilty of wrong in subsequently stealing the proceeds. The payment to him was binding upon the mill in accordance with the elementary rule that transactions had with an agent within the scope of his authority are binding upon the principal.

The case of Rivers v. Liberty Nat. Bank, 135 S.C. 107, 133 S.E. 210, is not to the contrary. Payment of checks was made in that case, not to the manager of the corporation's business, as was the case here, but to a mere bookkeeper whose authority was limited to depositing the checks in the bank. The same distinction applies to Standard Steam Specialty Co. v. Corn Exchange Bank, 220 N.Y. 478, 116 N.E. 386, L.R.A.1918B, 575.

■ It is argued, however, with particular reliance upon Rivers v. Liberty Nat. Bank, supra, that the authority of Link was in some manner limited because the checks cashed were indorsed "for deposit"; but we do not think that this indorsement affects the matter. It is provided by section 48 of the Negotiable Instrument Act, section 3699 of the S.C.Civil Code of 1922, that the holder may at any time strike out any indorsement which is not necessary to his title. If it could be stricken out, its restrictive character could be waived by the holder who was also the indorser (Cf. Brook v. Vannest, 58 N.J.L. 162, 33 A. 382); and the acceptance of cash on the check when negotiating it constituted such waiver. The authority of Link, which extended to the collection of cash on checks as well as to depositing them, was unquestionably broad enough to cover the waiver. If he had authority to indorse the checks in the name of the mill and collect the cash on them, as is admitted, it necessarily follows that he had authority to waive the restrictive character of a special indorsement which he himself had placed on them

and to collect them as though they had been generally indorsed. This breadth of authority effectually distinguishes the case from Rivers v. Liberty Nat. Bank, supra, where the check was cashed by a bookkeeper who had no authority except to indorse the checks for deposit and to deposit them.

■■ The question arises in this connection whether the fact that the checks were indorsed "for deposit" was not sufficient of itself to put the bank on notice of the intended conversion on the part of Link. We do not think so. The duplicate certificates of deposit as issued by the bank showed only the deposits actually made; and the bank thus knew that the records made did not show that the checks were being deposited. The checks after performing their function were returned to the drawers thereof and not to the mill, and it was apparent that the restrictive indorsement could not deceive auditors of the mill as to the use made of them. We cannot see, therefore, that the cashing of the checks with this restrictive indorsement would have had any greater tendency to apprise the bank of the fraudulent conduct of Link than if they had been cashed upon the general or unrestricted indorsements which he was authorized to make. The point is made that the suspicions of the bank should have been aroused by the number of checks cashed; but it must be remembered that these were cashed over a period of three years and that during that period no notice was given the bank of any irregularity. Link handled money for the mill, drew money out of the bank for mill purposes, had complete charge of its affairs, and we can see nothing suspicious in the fact that he was getting cash on a check instead of drawing on the mill's bank account for that purpose. The officers of the bank saw nothing suspicious in this at the time; and their conduct is to be judged in the light of circumstances as they then appeared, not in the light of subsequent disclosures. Wisdom after the event is always easy.

■ The point is made that the authority of Link must be held limited by the signature card filed with the bank and that the cashing of the checks was unauthorized because they were not indorsed in the handwriting of Link and in the form set forth in the signature card. We think this contention entirely without merit. The purpose of the signature card was to prevent

forgeries and to indicate to the bank what officers of the mill were authorized to draw checks against its account or transact other business with the bank. It was in no sense a limitation upon the power of the mill's officers. As we have seen, the cashing of the checks by Link was within his authority; and there is no question as to the fact that he himself indorsed and cashed them. To hold that the bank is not protected in paying funds to an officer of a corporation authorized to receive them, merely because such officer does not indorse the instrument upon which collection is made in a particular form, would be carrying technicality to an extreme not warranted by any decision of which we have knowledge.

The jury were instructed that recovery by plaintiff would be precluded if the loss sustained by the mill was due to the negligent failure of its officers and directors to properly supervise the conduct of Link. It would seem that the evidence relied upon to establish this negligence tends rather to establish wide managerial authority on the part of Link, and that the charge as to negligence was not warranted. But as verdict should have been directed for defendant in any event, error in this respect was harmless and should be ignored.

For the reasons stated, the judgment appealed from will be affirmed.

Affirmed.