## FEDERAL SAVINGS & LOAN INS. CORPORATION v. FIRST NAT. BANK, LIBERTY, MO.

### No. 13510.

Circuit Court of Appeals, Eighth Circuit.

Dec. 26, 1947.

Rehearing Denied Jan. 17, 1948.

Charles M. Miller, of Kansas City, Mo. (Ray E. Dougherty, of Washington, D. C., on the brief), for appellant.

William S. Hogsett, of Kansas City, Mo. (Martin E. Lawson and Francis G. Hale, both of Liberty, Mo., on the brief), for appellee.

Before GARDNER, THOMAS, and JOHNSEN, Circuit Judges.

GARDNER, Circuit Judge.

This was an action for money had and received, brought to recover $52,541.99 with interest. The complaint upon which the action was tried contains twenty-four counts, each alleging a cause of action for money had and received by means of a check drawn against the account of the Liberty Federal Savings and Loan Association, Liberty, Missouri, on the First National Bank, Liberty, Missouri. The Liberty Federal Savings and Loan Association on September 7, 1943, went into the hands of a conservator to conserve its assets pending further disposition of its affairs. Investigation disclosed irregularities in the conduct of the business of the Association and thereafter appellant Federal Savings and Loan Insurance Corporation made payment to the Association of an amount sufficient to restore it to a condition of solvency and took assignments from the Association of the claims here sued upon. It will be convenient to refer to the parties as they were designated in the trial court, or by their names.

At all times involved in this action Harold Wilson was president of the Loan

Association and the checks involved were the checks of the Association signed either by Wilson as president or by the secretary of the Association and were all payable to the order of the First National Bank of Liberty, Missouri. On presentation to that bank they were credited to the account of Wilson. The defendant admitted that the checks were credited to Wilson's account in the bank but defended its action in so doing upon the grounds among others: (1) that Wilson had apparent authority to deal with the funds of the Association in the manner he employed; (2) that had the bank made inquiry of the Board of Directors of the Association, an examination of its records would have revealed credit balances in favor of Wilson in an amount equal to or greater than the checks, and hence, the Association suffered no loss. There were other contentions in the trial court which are urged here by the defendant but we think it will be unnecessary to consider them in detail.

The record is a very voluminous one, made up not only of a transcript of the oral testimony but of many exhibits. The trial court entered findings to the effect that the checks were all signed by Howard Wilson as president or by Aileen Chrisman as secretary of the Association and that these officers were respectively authorized to sign the checks and the Bank was so notified by the Association. The court specifically found that, "At the times in question Harold Wilson was president and chief managing officer of the Association, and the board of directors had delegated to him, and he at all times exercised, plenary authority in the management of its affairs. So far as the Bank was concerned, Harold Wilson had apparent authority from the Association to cash, or to deposit to his own credit in the Bank, checks of the Association drawn on the Bank and made payable to the Bank. Specifically, he had apparent authority from the Association to deal with the checks in question as he did deal with them."

The court also found that the Association suffered no loss by reason of the check transactions here involved; that

none of the proceeds of any of the checks entered into or became any part of the Bank's assets; that had the Bank pursued inquiry with reasonable diligence it could not have discovered any misappropriation by Wilson of the proceeds of any check involved in this suit; that the Bank was not guilty of any negligence in any of the check transactions; that as to each check involved no claim has ever been made and no claim exists against the Association or its conservator or assignee on account of the disposition of the proceeds of such check and "the Association has not suffered or incurred any loss or liability on account of the disposition of the proceeds of such check." The court in its findings set out in detail that each check was shown on the books of the Association to have been charged against a credit balance which was sufficient to cover the check. The books and records of the Association were received in evidence.

Wilson carried three deposit accounts in the defendant Bank, one in his own name, one in the name of the Harold Wilson Insurance Agency, and one in the name of Home Owners Realty Corporation. Defendant knew that all money deposited in any of the three accounts went to Wilson. Between December 31, 1937 and July 19, 1943, the twenty-four checks here involved were drawn upon the account of the Loan Association in the defendant Bank, the checks being payable to the order of the Bank. On presentation they were deposited in one or the other of three above noted deposit accounts maintained by Wilson, and Wilson or Aileen Chrisman made up the deposit slips. It is admitted in the brief of plaintiff that it was not entitled to judgment on the checks set out in Counts XII, XXI and XXIV, aggregating $15,300.55, and that as to these counts the court properly denied its motion for judgment, and plaintiff's witness Rohlfs, an examiner for the Federal Home Loan Bank Administration testified that no loss was sustained by the Association on the check set out in Count XV, nor had it suffered any loss on the check set out in Count XIV.

It is earnestly contended by appellant that the case of Federal Savings

& Loan Ins. Corp. v. Kearney Trust Company, 8 Cir., 151 F.2d 720, 722, is so similar in its facts as to be determinative of the present case in favor of plaintiff. In the Kearney case we held that the burden was upon the Kearney Trust Company, defendant in that action, "(a) to plead and prove as a defense payment at the direction of the Loan Association, or (b) that Wilson had authority to direct that the checks be credited to his account." We held that the defendant in that case had not met that burden. It is contended by the defendant in the instant case that it has met that burden. Certainly, if the findings of the court are sustained by substantial evidence, the judgment appealed from should be affirmed. These findings are presumptively correct and must be sustained unless clearly erroneous. Rule 52 (a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c; Dumas v. King, 8 Cir., 157 F.2d 463; Kincade v. Mikles, 8 Cir., 144 F.2d 784. We are not at liberty to substitute our judgment for that of the trial court and on appeal that view of the evidence must be taken which is most favorable to the prevailing party, and if, when so viewed, the findings are supported by substantial competent evidence they should be sustained.

As great reliance is placed upon the Kearney Trust Company case we should perhaps first note some of the features which we think distinguish that case from the case at bar. In that case there was no course of dealings between the Association and the Kearney Trust Company, and the Kearney Trust Company was payee of the checks and not the drawee as was the defendant in this case. In the Kearney case no evidence was offered showing what authority the Board had delegated to Wilson, nor indeed what authority he customarily exercised in the management of the Association and in the handling of its affairs. There was no evidence of Wilson's dealings with the Association as shareholder and borrower or that he received large sums of money from the Association for salary, insurance premiums, proceeds of loans and redemption of shares. Neither was there any evidence in the Kearney case that it acted in reliance upon annual audits by the federal examiners; indeed, the Kearney Trust Company rendered no statements of account to the Association and there was no evidence that it had ever dealt with the Association at any time upon any subject, or that it had ever dealt with Wilson before he began depositing the fifteen checks there involved. The Kearney Trust Company, according to the record in that case, acted solely upon the declarations of Wilson as to his authority, and we were of the view that the agent's declarations were not competent evidence as to his authority. In that case there was no competent evidence of Wilson's authority. In the present case there was a great deal of evidence going to the actual, implied or apparent authority of Wilson. We are therefore of the view that the issues in this case are not conclusively determined by the Kearney Trust Company case because many facts are disclosed by the record in this case which did not appear in the record in the Kearney case.

As before noted, Wilson as president and Miss Chrisman as secretary signed all the checks in controversy. That they had authority so to do is conclusively shown by the annual resolutions of the Board of Directors of the Association. The Bank was notified of the authority of these officers to sign and issue checks. On January 29, 1938, the Board of Directors of the Association changed the procedure in this regard by dispensing with the necessity of a countersignature on its checks and directed that all checks thereafter need only be signed by one officer. Written notice was given the Bank that "Heretofore it has been the custom of the Association to require that all checks be countersigned. This ruling has been amended and countersignatures are no longer required." The checks as they were presented to the Bank were therefore legal and valid. It is, however, argued that it was not within the actual or apparent authority of Wilson to deposit them to his own credit in the Bank. As to this the court found that the Association was bound by Wilson's acts. Bear-

ing on this practice there was evidence which stands without dispute that the fact that the checks were made payable to the Bank was in accordance with a long standing course of dealing. Mr. Cooper, president of the Bank, testified as follows: "Well, it is a matter of frequent occurrence for checks to be made payable to the bank where the party has an account there and wants to cash the check, or wants to hand it to a second party, who also has an account in the bank where he wants it deposited, or where checks are drawn for the benefit of a third party who owes the bank and wants the check drawn that way in order to pay his indebtedness to the bank."

■ Wilson received from time to time substantial sums of money from the Association. His annual salary was three-fourths of one per cent of the total assets of the Association and was paid in monthly installments. He also received premiums for all insurance written on all properties mortgaged to the Association. The borrower was required to keep the mortgaged property fully insured and Wilson had the exclusive privilege of writing the insurance. The Association collected the premiums and paid them to Wilson and the amounts so paid to him were very substantial. Many checks of the Association evidencing these payments were deposited in Wilson's three bank accounts in the defendant Bank by means of checks payable to the order of the Bank. The Bank's records showed a total of 111 deposits aggregating $82,892.10 in Wilson's individual account, 272 deposits aggregating $112,655.65 in his insurance agency account, and 257 deposits aggregating $92,625.34 in his Home Owners Realty Corporation account. The Association's payments to Wilson during the time in question aggregated $293,173.09 in his three accounts, all payments being made by checks drawn payable to the order of the Bank. Of this total 19 checks aggregating $32,490.53 are questioned in this suit, and as to the remaining 621 deposits aggregating $260,682.56 there has never been any question. It therefore appears that the deposit of the Association's checks to Wilson's credit had continued for many years with no sugges-

tion of irregularity. This long course of dealing from the Bank's standpoint seems to have been acquiesced in by the Association and at least refutes any suggestion of bad faith on behalf of the Bank. Annual audits of the Association by the examining authorities of the Federal Home Loan Bank board were made to the knowledge of the Bank and in connection with such audits examiners called at the Bank to check the Association's bank account. The examiners had free access to all of the Association's cancelled checks, pass books, ledger account with the Bank, cash disbursement books, and all other accounts bearing upon or reflecting the transactions here involved, including the minutes of the director's meetings. These examiners with the knowledge of the Bank investigated to see whether the Association's balance in the Bank was the same as the balance shown on the Association's books, and at all times found that the balances agreed. The examiners never questioned the manner of depositing the proceeds of any checks drawn by the Association on the Bank and it is urged that if the Bank had the right to assume that Wilson's action in depositing the Association's checks to his own credit was irregular or lacking in authority, the federal examiners would not have approved the practice. The board of directors, which was vested with the responsibility for the management of the Association, delegated to Wilson and Wilson exercised wide authority in managing the Association's affairs, and based upon the minutes of the board and the course of dealing which had continued for many years, the court found that Wilson, "was invested by the board with plenary powers and the defendant was so advised." In this connection Mr. Cooper testified that the fact that the federal examiners annually examined the books of the Association and found nothing wrong with Wilson's handling of the checks and made no complaint to the bank in response to statements of accounts submitted seventy-two times during five and one-half years covered by the checks in question, led him to believe that Wilson had complete authority to handle the checks as he did. The Association must be held to be bound

by the acts of Wilson within the actual or apparent scope of his authority, and it is held that the authority of a corporate officer "may be inferred from the general manner in which for a period sufficiently long to establish a settled course of business, he has been allowed, without interference, to conduct the affairs" of his principal. Martin v. Webb, 110 U.S. 7, 3 S.Ct. 428, 433, 28 L.Ed. 49; Maloney Tank Mfg. Co. v. Mid-Continent Petroleum Corp., 10 Cir., 49 F.2d 146. Of necessity a corporation can act only through its officers or agents. An agency for a corporation may be proved and authority to act for it may be implied as in the case of natural persons, and where an officer has been allowed in his official capacity in the usual course of dealing to manage its affairs, authority to represent the corporation may be inferred from the manner in which he has been permitted by the directors to transact its business and proof of the customary exercise of authority by an agent may be substantial evidence. Approval of a corporation of acts done by its officers or agents may be inferred in the same manner as the assent of a natural person and such approval or assent need not be manifest by any vote or formal resolution of the corporation; in fact, no higher degree of evidence is required in establishing assent or ratification on the part of a corporation than is required in showing original authorization. The evidence, viewed in a light most favorable to defendant, surely tended to prove that Wilson was an officer whose authority was practically plenary. Whatever business was being transacted by the Association was being transacted by Wilson. As said by this court in Schneider v. Thompson, 8 Cir., 58 F.2d 94, 97, "he practically was the bank." Compare: Southern Life Insurance Co. v. McCain, 96 U.S. 84, 24 L.Ed. 653; Glens Falls Indemnity Co. v. Palmetto Bank, 4 Cir., 104 F.2d 671; Union Indemnity Co. v. Home Trust Co., 8 Cir., 64 F.2d 906.

■ It stands without dispute that it was the common practice of the Association to issue checks payable to the Bank in cases where the person entitled to the money wanted it done that way, as when such person wished to deposit the check to his own credit in the same bank, or hand it to one of his creditors having an account there, or where a check was issued to a person who owed the Bank and wanted the check drawn in that manner so he could pay his debt to the Bank. It also appears that the Association had drawn 168 checks totaling $142,935.63 payable to banks in addition to the 24 checks in question. The mere fact, therefore, that these checks though made payable to the Bank were credited to Wilson's accounts in the Bank was not, in view of the admitted practice and long course of dealing, a suspicious circumstance. Where a check is drawn to the order of the bank to which the drawer is not indebted the bank may not appropriate the money but is authorized to pay the proceeds only to persons specified by the drawer.

■ An expert witness produced by the plaintiff admitted on cross-examination that each of the checks in question was drawn against credit balances which Wilson owned either directly or through some "straw." It appears without dispute that as each check was issued a voucher bearing a corresponding number was made, showing the account to which the check was charged. If a check were issued to redeem savings shares it was charged against the account of the shareholder. If a check were drawn to pay an amount due a borrower as proceeds of a loan it was charged against the account of such borrower, and in either case the charge was then posted to the cash disbursements book, to the journal, to the subsidiary ledger and to the general ledger. These facts all appeared in the records, files and accounts of the Association and were known, or must be presumed to have been known so far as third parties are concerned, by the directors of the Association. As has been previously observed, the Bank knew that federal examiners made annual audits and examinations of the books and records of the Association, and the records disclose that the board of directors monthly approved a statement of its financial condition presented by Wilson. These records clearly showed that Wilson was using these checks drawn to the order of the Bank in the manner here disclosed.

In view of all these circumstances there was no reason why the Bank should have doubted Wilson's authority to use these checks as he did; at least, the trial court might reasonably have so inferred.

The trial court also found that there was no misappropriation of the proceeds of the checks here involved and that the Association suffered no loss and incurred no liability on account of the disposition of the proceeds of these checks. This is an action for money had and received. It is equitable in its nature and is founded upon the principle that no one ought unjustly to enrich himself at the expense of another. If, therefore, there was no misappropriation of the proceeds, there is manifestly no right of recovery. The trial court in its opinion said: "The evidence was conclusive that in each case the check discharged an equal liability of the Association either created by the specific act of the board of directors of the Association or by the basic or fundamental law of the Association."

It would unduly lengthen this opinion to trace each of these 24 checks as was done with meticulous care by the trial court, and as we are of the view that the court's finding and conclusion to the effect that Wilson had actual and apparent authority to handle these checks in the manner in which he did handle them necessitates an affirmance of the judgment, it seems unnecessary to consider the other challenged findings. The judgment appealed from is therefore affirmed.