404 P.2d 125

Charles A. COOPER, John H. McDowell, Thomas Hall, Clair Miller, L. E. Meyer, Otis Campbell, Trustees of the New Mexico Pipe Trades Welfare Trust Fund, Plaintiffs-Appellees,

v.

ALBUQUERQUE NATIONAL BANK, a banking corporation, Defendant-Appellant.

No. 7540.

Supreme Court of New Mexico.

July 12, 1965.

Knight, Sullivan & Hurley, Albuquerque, for appellees.

Modrall, Seymour, Sperling, Roehl & Harris, Daniel A. Sisk, Albuquerque, for appellant.

CHAVEZ, Justice.

This is an appeal from a judgment in favor of plaintiffs-appellees in the sum of $52,000.

Appellees filed suit alleging that from October 14, 1953, to March 15, 1958, certain checks drawn in favor of appellees in the total amount of $119,551.35 were paid by appellant Bank on forged, unauthorized, unlawful, fraudulent, or irregular endorsements; that appellees had no knowledge thereof until October 28, 1958, but that appellant knew or should have known thereof prior to said date. Appellant's answer denied both the alleged amount of such checks and that the endorsements on such checks were forged, unauthorized, unlawful, fraudulent or irregular. Appellant also denied that it had knowledge of any such checks having been wrongfully endorsed and that appellees did not have knowledge thereof. As a separate and alternative defense, appellant alleged that appellees were estopped from maintaining the action because the conduct of appellees and their predecessors was the proximate cause of their loss; that appellees' loss resulted proximately from their own negligence; that appellees' loss resulted solely and proximately from the breach by appellees or their predecessors of their fiduciary duties as Trustees of the New Mexico Pipe Trades Welfare Trust Fund; and that appellees were guilty of laches. Appellant further alleged, as an alternative defense, that it had no knowledge of any breach of fiduciary obligation to appellees by any fiduciary of appellees, and that it had no duty to make inquiry in that regard.

The parties stipulated the following facts:

"1. That during the period from October 14, 1953, to March 13, 1958, various persons and firms, for valuable consideration, executed checks drawn upon various banks, payable to New Mexico Pipe Trades Welfare Trust Fund, which checks were delivered to John A. Peke, who was Administrator of said trust and who was also General Manager of Associated Plumbing, Heating and Piping Contractors of New Mexico, Inc.

"2. That the said John A. Peke endorsed said checks by rubber

stamp endorsement in the following form:

'NEW MEXICO PIPE TRADES
WELFARE TRUST FUND
118 Cedar N. E.
Albuquerque, N. Mex.'

which endorsement was immediately followed by another stamp endorsement in the following form:

'Pay to the Order of

ALBUQUERQUE NATIONAL
BANK
Albuquerque, New Mexico

FOR DEPOSIT ONLY

All prior endorsements guaranteed A-254 Associated Plumbing A-254 Heating & Piping Contractors of New Mexico, Inc.
118 N. Cedar.'

That attached hereto is a copy of a check handled and endorsed in the aforementioned manner.

"3. That the said John A. Peke presented the said checks to the Albuquerque National Bank for deposit in the account of Associated Plumbing, Heating and Piping Contractors of New Mexico, Inc., and said checks were deposited in said account.

"4. All facts heretofore admitted in the pleadings and in the interrogatories are incorporated herein and made a part hereof by reference.

"5. That the allegations of the complaint and answer herein are limited to those checks drawn, endorsed and deposited in the manner and form set forth herein, the total sum of which checks has not at this time been established."

The trial court found that appellees are trustees of the New Mexico Pipe Trades Welfare Trust Fund, a legal entity established for the purpose of administering a trust for the benefit of certain designated persons employed by members of the Associated Plumbing, Heating and Piping Contractors of New Mexico, Inc., hereinafter referred to as the "Association;" that John A. Peke was general manager of the Association and administrator of the New Mexico Pipe Trades Welfare Trust Fund, hereinafter referred to as the "Trust Fund," which two legal entities maintained and operated a joint office for the purpose of transacting the business of both organizations; that the Association administered the Trust Fund and paid all bills and salaries of employees of the Trust Fund, for which administrative services the Association was paid a certain agreed percentage of the receipts of the Trust Fund; that the members of the Association were required to pay, weekly or monthly, certain sums to the Trust Fund

to be used for Trust Fund purposes; that the following written contracts were entered into between appellees and defendant Bank:

"Signature card dated November 30, 1953, containing the following:

'RESOLVED, that xxxxx <u>Two Signatures Required</u>, President ——, Vice-President, or <u>Harold Troyer</u>, Secretary <u>John Peke, Administrator</u> of this corporation may, and they are hereby authorized to sign checks and drafts for and on behalf of this corporation, and that each of them be and is hereby authorized to endorse for and on behalf of this corporation, checks and other instruments for deposit, encashment or otherwise; and that the Albuquerque National Bank, Albuquerque, New Mexico, be, and it is hereby authorized to pay on account of this corporation any and all checks and other instruments signed and/or endorsed in accordance herewith.'

"Signature card dated January 30, 1956, containing the following:

'RESOLVED, that either ——, President, or ——, Vice-President, or <u>Thomas W. Hall, Secretary-Treasurer</u>, Secretary, <u>John Peke, Administrator</u> of this corporation may, and they are hereby authorized to sign checks and drafts for and on behalf of this corporation, and that each of them be and is hereby authorized to endorse for and on behalf of this corporation, checks and other instruments for deposit, encashment or otherwise; and that the Albuquerque National Bank, Albuquerque, New Mexico, be and it is hereby authorized to pay on account of the corporation, any and all checks and other instruments signed and/or endorsed in accordance herewith.'

"This Resolution was amended by the following notation under Special Instructions:

'2 (Two) Signatures required.' " that Thomas W. Hall, the trustee whose name appears on the Trust Fund signature card dated January 30, 1956, never endorsed any of the Trust Fund checks, and that none of the persons whose names appear on either of the two signature cards ever endorsed by signature any of the Trust Fund checks; that the actual authority of John A. Peke was expressed as per the written instructions of appellees to appellant in that two (2) signatures were required for encashment of any checks or the endorsement thereof; that John A. Peke did not have the authority to endorse the checks payable to the Trust Fund which he presented to appellant for deposit in the Association's account, and that the deposit

thereof by appellant was contrary to the agreement of the parties as evidenced by the signature cards existing as legal contracts between the parties; that by virtue of the signature cards furnished to appellant by appellees, appellant had actual knowledge that John Peke did not have authority to endorse the checks payable to the Trust Fund and presented to appellant for deposit into the account of the Association; that the accounting firm now known as Robertson and Summers was employed by the Trust Fund to help set up a bookkeeping system which included a systematic journal to reflect under different headings the various receipts, deposits and disbursements of the Trust Fund, and that said journal admitted in evidence herein, was kept in the joint office of the Trust Fund and the Association and was available to appellees at any time; that at meetings of appellees it was the custom and practice that minutes of the previous meeting were read, approved and signed by the chairman, and that copies of said minutes admitted in evidence constitute the complete, authentic and accurate minutes of the meetings of appellees during all times material hereto; that the monthly bank statements admitted in evidence, pertaining to the checking account of the Trust Fund throughout the period in question and furnished by appellant to appellees, reflect that all of the receipts of the Trust Fund, as shown by its journal, were not being deposited in its said checking account in appellant Bank; that appellees made demand upon appellant for the amount due to them for checks received by appellant for the benefit of appellees, but withheld from appellees by appellant, which demand was refused by appellant; and that appellant wrongfully withholds from appellees the amount of the judgment that has been stipulated herein in the amount of $52,000.

Under its first point appellant contends that John A. Peke had actual authority from the Trust Fund to deposit a part of the receipts of the Trust Fund directly to the account of the Association, and appellant had no duty to make inquiry with regard to breach by Peke of his fiduciary obligations to the Trust Fund and is not chargeable with notice of any such breach.

Appellant argues that the evidence clearly establishes that Peke had actual authority from appellees to deposit part of the receipts of the Trust Fund directly to the Association's account, and that express authority was given by the minutes of the November 20, 1953, meeting of the Trust Fund, which are in part as follows:

"Meeting called to order at 2 p. m. by Chairman Smith; those present were Mark Gray, Harry Driver, John McDowell, Charles Cooper and Earl Smith.

"* * *

"The manager asked for permission to engage T. D. Smith of the firm of Robertson & Drummond to help in setting up an accounting system and a method of establishing individual cards for those insured. Motion by Gray that permission be granted, seconded by Cooper, to the Manager to make arrangements with Mr. Smith to not only install, but to supervise the system, help the Manager in any way possible in combining the Trust Fund with the activities of the Association, that it is to be understood that John Peke is, of course, an employee of the Association and that his services as Manager of the Trust are to be construed as a Manager of another program of the Association, carried.

"Gray brought up for discussion the problem of the Association being paid for the operation of the Trust in that it might jeopardize the Association's tax exemption status. Peke called Smith by phone and he promised to have an answer for the next meeting. Gray offered a motion that the Manager and T. D. Smith be given the authority to get legal advice and to establish whatever method is necessary in making payment or depositing of funds to the Association that are due it as custodian of the Trust Fund, protecting the Association's tax status that either the Manager or Mr. Smith, who is the Association auditor, make necessary deposits, this in case the Manager should be out of town, seconded by Cooper, carried.

"Chairman Smith asked the Manager, if in his opinion, the work of handling the Trust would require more than half of his time. Peke suggested that as the Trust would grow that it might require more time and everyone should keep in mind that it would also take the full time of one girl bookkeeper. Gray stated that Peke was aware that the custodianship of the Trust Fund belonged to the Association and should he leave the employ of the Association, he could not take the Trust Fund custodianship to some other office or organization. Driver suggested that this being true, the Association should pay all bills and salaries, thus saving social security and employment taxes, that this would solve the problem of jeopardizing the Association's tax exemption question, just deposit whatever monies are due the Association directly to the Association's bank account and avoid any misunderstanding, then there would be no question of payment for services, rentals or expenses. Trustees agreed that this was a good proposal and that the manager should follow the suggestions as outlined.

" *   *   *

"Meeting adjourned by the Chairman, 5:30 p. m.

"/s/ Earl E. Smith

Chairman"

From the above minutes it is apparent that on November 20, 1953, Peke was given authority to deposit whatever monies were due the Association directly to the Association's account. However, no method is set forth in the minutes stating how Peke was to make the deposits; instead, the minutes specifically state that Peke and T. D. Smith were given authority to "establish whatever method is necessary in making payment or depositing of funds to the Association."

Appellant argues that Peke's breach of his fiduciary duties occurred when he deposited more of the Trust Fund receipts than they in fact owed to the Association.

With regard to Peke's authority in this situation, we quote from Restatement of the Law, Agency 2d, Ch. 1, § 7(c), p. 29, Express and implied authority, as follows:

"* * *

"It is possible for a principal to specify minutely what the agent is to do. To the extent that he does this, the agent may be said to have express authority. But most authority is created by implication. * * *"

and from Ch. 3, § 35, p. 123, When Incidental Authority is Inferred:

"Unless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it."

and from Ch. 3, § 76, p. 195, When Authority is Inferred:

"Unless otherwise agreed, an agent is not authorized to execute or to endorse negotiable paper unless such execution or endorsement is usually incident to the performance of the acts which he is authorized to perform for the principal."

In 37 A.L.R.2d, p. 461, we find the following:

"From an a priori standpoint it is difficult to see how the authority of an agent to indorse commercial paper can arise from any source other than (1) actual authority, or (2) apparent or ostensible authority.

"When a principal expressly authorizes his agent to indorse commercial paper, there would seem to be little question that an actual authority is involved. And, it would seem that when the principal gives the agent certain duties or responsibilities from which it may be inferred that he intended the agent to have the authority to indorse, an actual authority is intended. The difference between the two situations appears to be one of degree, rather than one of kind."

From the authorities quoted above we are of the opinion that on November 20, 1953, Peke was given the necessary authority to endorse the checks payable to the Trust Fund, the endorsement being necessarily incidental to his authority to make the deposits in the Association's account.

Appellees contend, however, that this authority was revoked or superseded by the contractual transactions, i. e., by both signature cards, specifically the one dated November 30, 1953, and the one dated January 30, 1956. There is no dispute that the subsequent signature cards signed by the trustees and officers were contractual obligations, and that both cards are identical in form and substance except for the signatures required, such difference being brought about by a change in appellees' officers. Since the signature card agreements were entered into after the aforementioned minutes, one on November 30, 1953, and the other on January 30, 1956, the dates during the period that Peke was depositing incorrect amounts to the benefit of the Association, appellees argue that the signature cards contained "exclusively" the only signatures which appellant could recognize as authorized to make the deposits. Appellees argue that, since none of the signatures on the signature cards were used in making the deposits, appellant wrongfully cashed the checks and is liable to appellees for the stipulated amount.

Appellees cite no direct authority to support their statement that the signature cards revoked or superseded the authority previously given to Peke to deposit checks made out to the Trust Fund to the Association's account. In the absence of any authority to support this contention and in view of the facts hereinafter set forth, we are of the opinion that Peke had the necessary authority, at all material times to the issue presented, to deposit Trust Fund checks directly to the Association's account.

We find no evidence and none has been called to our attention that Peke's authority was ever revoked or superseded. Furthermore, it is clear that the trustees feared that the avowed purpose of avoiding the loss of the Association's tax exempt status would have been defeated, had all of the receipts of the Trust Fund been first deposited in its own account and then paid to the Association for the management services earned by the Association.

In Glens Falls Indemnity Co. v. Palmetto Bank (W.D.S.C.1938), 23 F.Supp. 844, the court discussed the reasons for and the effect of signature cards in bank transactions. This excellent opinion also disposes of appellees' contention in the instant case that appellant failed to follow reasonable banking standards by depositing the checks which were endorsed only by means of a rubber stamp. In the Glens Falls case one

C. L. Link, Jr. embezzled $15,840.80 from Watts Mills, a corporation, by endorsing checks payable to Watts Mills and cashing them himself. Link was the secretary, assistant treasurer and the active executive in charge of the business and affairs of the mill. Defendant Bank had on file a signature card with Link's name and the name of the president of the company stating "either signature and only one signature necessary." Link embezzled the funds by endorsing the checks with a rubber stamp and receiving the money from the bank. The court decided the issue in favor of the bank, despite plaintiff's protestations that, because the signature card required a signature of either Link or the president, the bank was negligent in cashing checks which were endorsed with a rubber stamp which, not being a signature, obviously did not comply with the provisions of the signature card. The court stated:

"But plaintiff contends that the signature card was an express limitation of authority of which the bank had actual notice. It is true that where a party dealing with the agent knows the extent of the agent's powers, the principal is not bound by an act beyond the scope of the express authority conferred. It is always competent for a principal to limit the authority of his agent, and if such limitations have been brought to the attention of the party with whom the agent is dealing, the power to bind the principal is defined by the limitation. The mill did not notify the bank of any limitation of authority placed upon Link or Henry. The board of directors by resolutions did not limit the manner in which Link should cash or deposit checks. The by-laws of the corporation contained no such provisions. Link and Henry signed the signature card at the request of the bank. They, by so doing, did not attempt to limit the authority of either, but merely furnished the bank with their signatures as officers of the mill who were authorized to do business with the bank. The signature card did not, nor did it purport, to state the extent of the authority of either Henry or Link in dealing with the bank.

"A signature card is executed for the benefit of the bank to help detect forgeries, to obtain the signatures of the parties authorized to draw checks on the account at the bank and to ascertain what persons are authorized to check on the account. In this case it served a twofold purpose (1) it was to obtain the authorized signatures of the officers with whom the bank was empowered to do business, and (2) it carried by implication, at least, a representation that the individuals whose signatures were signed thereto were the authorized agents of the mill to transact any business with the bank.

"The signature card is what its name imports, a card containing authorized signatures. It does not say that that is the only way in which the payment of the funds on the account could be made, or the transaction of other business on the account could be handled. Henry could have stamped a check 'Watts Mills by R. E. Henry, President and Treasurer' and lawfully received the cash for Watts Mills without signing his name. Link could have done likewise and rightfully received the cash for the mill.

"If plaintiff's contention is correct, then the rubber stamp indorsement 'For deposit account of Watts Mills, Laurens, S. C.—C. S. Link, Jr., Assistant Treasurer' was not within the limitations of the signature card, because it was not signed by either Link or Henry; it was not, therefore, an authoritative restrictive indorsement. If this contention of plaintiff is sound, the rubber stamp indorsement was a nullity. I do not construe the signature card to mean that no business could be transacted with the bank without the signature of either Link or Henry. If this were true no money could have been deposited in the bank unless some instrument were signed by one or the other. If Link received a check payable to Watts Mills and deposited this check, this would constitute a transaction of business on the mill's account with the bank. He could have done this without signing anything."

The Glens Falls case was affirmed by the fourth circuit court of appeals, 104 F.2d 671, stating:

"The point is made that the authority of Link must be held limited by the signature card filed with the bank and that the cashing of the checks was unauthorized because they were not indorsed in the handwriting of Link and in the form set forth in the signature card. We think this contention entirely without merit. The purpose of the signature card was to prevent forgeries and to indicate to the bank what officers of the mill were authorized to draw checks against its account or transact other business with the bank. It was in no sense a limitation upon the power of the mill's officers. As we have seen, the cashing of the checks by Link was within his authority; and there is no question as to the fact that he himself indorsed and cashed them. To hold that the bank is not protected in paying funds to an officer of a corporation authorized to receive them, merely because such officer does not indorse the instrument upon which collection is made in a particular form, would be carrying technicality to an extreme not warranted by any decision of which we have knowledge."

■ Brady on Bank Checks, 2d Ed., § 48, Form of indorsement, p. 73, states:

"* * * a rubber stamp indorsement is valid and sufficient to transfer title to the instrument indorsed, when made by one having authority, * * *."

Appellees cite Industrial Plumbing & Heating Supply Co. v. Carter County Bank, 25 Tenn.App. 168, 154 S.W.2d 432, for the opposite conclusion than that reached in the Glens Falls case. That case is distinguishable from the instant case because the employee, the company's bookkeeper, had no authority to endorse checks and no issue of actual authority was presented in that case. In the Industrial Plumbing & Heating case the court said that the bank cannot establish a custom and confer apparent authority upon an unauthorized agent, by recognizing the unauthorized agent's act over a period of time and then rely upon this custom as conferring apparent authority in the absence of knowledge of the custom to the principal.

A further point arises from the fact that, in the instant case, the signature card contracts stated, in addition to the wording hereinbefore set out, that:

"Below will be found duly authorized signatures which are to be recognized in the payment of funds or the transaction of other business on this account, and all rules and regulations of the Bank are hereby subscribed to."

■ In the fact situation before us there was no transaction of business with regard to the account referred to in the signature cards. The checks were payable to the Trust Fund but were never deposited in the Trust Fund's account. The transaction actually bypassed the Trust Fund account and went directly to the Association's account. The signature cards were meant to cover transactions on the Trust Fund's account. The Authority given to Peke to deposit checks directly to the Association's account covered only those transactions. The minutes of the November 20, 1953, meeting and the signature cards were entirely compatible with each other because they covered different situations.

■ Appellees argue that Chairman Smith did not sign the minutes of the meeting until Peke brought in a bundle of old minutes for his signature and that he signed them in a hurry. Appellees submitted no evidence to show that the November 20, 1953, minutes were in the bundle that Smith signed, but they rely on an inference that the November 20, 1953, minutes were included in the bundle signed by Smith, since Smith did not remember the matters discussed in the November 20, 1953, minutes. Because of this appellees contend that the minutes of the November 20, 1953, meeting were at the very least tainted. Appellees' contention is without merit because the trial court found:

"19. That the copies of the minutes of the Pipe Trades Trust Fund admitted in evidence herein constitute the complete, authentic and accurate minutes of the meetings of the trustees of the Pipe Trades Trust Fund during all times material hereto."

Appellees have not cross-appealed from the trial court's decision and the rule is that findings of fact unfavorable to appellee, not attacked by cross-appeal, must stand. Desmet v. Sublett, 54 N.M. 355, 225 P.2d 141.

Sections 33–1–1 to 33–1–12, N.M.S.A., 1953 Comp., constitute the Uniform Fiduciaries Act of New Mexico. Section 33–1–4 provides in part:

'* * * if any negotiable instrument payable or endorsed to his principal is endorsed by a fiduciary empowered to endorse such instrument on behalf of his principal, the endorsee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in endorsing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. * * *"

The Uniform Fiduciaries Act expressly includes an "agent" in its definition of "fiduciary." Section 33–1–1, supra.

In view of our decision that Peke had authority to deposit checks made out to the Trust Fund directly to the Association's account, and in view of §§ 33–1–1 and 33–1–4, supra, we hold that the lower court's decision was incorrect in holding that appellant is liable for Peke's deposits of more than the amount due to the Association.

Appellees contend that appellant had actual notice of Peke's breach of his authority because of the signature cards signed for the Trust Fund. In view of our holding that Peke had authority to make the deposits, regardless of the signature cards, and there being no further allegations or evidence of any knowledge on the part of appellant which would amount to bad faith, it follows that appellant was not put upon inquiry as to the amount Peke was authorized to deposit, and we hold that appellant is not responsible for the amount deposited by Peke which exceeded what he was authorized to deposit. Compare Transport Trucking Company v. First National Bank, 61 N.M. 320, 300 P.2d 476.

The judgment of the district court is reversed and remanded with direction to set aside the judgment heretofore entered and enter a judgment dismissing appellees' complaint. It is so ordered.

CARMODY, C. J., and MOISE, J., concur.