L & W ENGINEERING CO., INC., Antares Corp., and McKinney–Baker, Inc., Respondents,

v.

Richard HOGAN and Sharon Hogan, Appellants.

No. WD 45741.

Missouri Court of Appeals, Western District.

Aug. 10, 1993.

John Michael Torrence, Kansas City, for appellants.

George Edward Kapke, Independence, for respondents.

Before KENNEDY, P.J., and BERREY and SPINDEN, JJ.

KENNEDY, Presiding Judge.

Richard Hogan and Sharon Hogan appeal from judgments against them in favor of three plaintiff corporations in the corporations' claims for conversion of money.

The judgments, based upon jury verdicts, totalled $496,239.70 and were as follows:

Antares, Inc. v. Richard Hogan: Actual damages of $234,395.06 and punitive damages of $140,922.58; Antares, Inc. v. Sharon Hogan: $10,733.97 actual damages and $3,577.99 punitive damages;

L & W Engineering Co. v. Richard Hogan: $87,765.89 actual damages and $10,000 punitive damages; and

McKinney–Baker Co., Inc. v. Richard Hogan: $6,634 actual damages and $2,211.10 punitive damages.

The background facts are as follows:

George Ward and Richard Hogan became acquainted in 1982. In 1983, Ward employed Hogan, an accountant, to do accounting, bookkeeping and record-keeping work for Ward's corporation, Ward–Garrison, headquartered in Independence, Missouri. Ward–Garrison was in the business of manufacturer's agent, designing and building industrial machinery, and rebuilding industrial machinery.

Ward and Hogan began to discuss going into business together. Their first business venture was the 1985 purchase of L & W Engineering Co., one of the plaintiffs here, located in Wichita, Kansas. L & W Engineering served the airplane industry, as did Ward and Garrison. L & W was in a line of business related to that of Ward and Garrison, but L & W was capable of more sophisticated applications. Boeing Airplane Company was the main customer both of Ward–Garrison and L & W Engineering.

Ward and Hogan did not own the L & W stock directly; they formed Antares, Inc., one of the plaintiffs here, as a holding company to hold the L & W stock, while Ward and Hogan were equal stockholders of Antares.

Soon thereafter they purchased the stock of a corporation named McKinney–Baker Co., Inc., another of the plaintiffs here. McKinney–Baker also was a "millwright-type construction shop," in a business that complemented that of Ward–Garrison and L & W. The McKinney–Baker was placed in Antares.

Antares purchased a tract of land for commercial development on the east side of Blue Springs, on Duncan Road.

Ward and Hogan also purchased, for Antares, the assets of a video store, and started a video sales-rental business known as PDQ Flicks.

Hogan's role in the Ward and Hogan business relationship was to attend to all clerical, accounting, and legal matters connected with their ventures, while Ward was engaged in sales and engineering. Ward continued to operate his Ward–Garrison engineering firm (in which Hogan was never involved), and also the L & W operation. Ward paid very little attention to those aspects of the business which were Hogan's responsibility. Hogan's written reports to Ward were few and sporadic, but Ward requested no more than he received, and actually paid very little attention to the financial and record-keeping aspects of the businesses. Ward's and Hogan's opportunities for discussion were mostly confined to their occasional automobile trips to and from Wichita. So far as we can see from the record, directors' meetings were rarely held and minutes were kept only sporadically. Ward was the president of each of plaintiff corporations, and Hogan the secre-

tary-treasurer. Hogan wrote all the checks on the corporate accounts.

Before the beginning of Hogan's business association with Ward, Richard Hogan and defendant Sharon Hogan, Richard's wife, purchased for commercial development a tract of land in Independence, Missouri, at 2400 Lee's Summit Road. The development was named "Fountain Plaza." During the period he and Ward were doing business together, Hogan began to construct a commercial building on this land, with offices and retail space. The title to the Fountain Plaza real estate remained in the Hogans' names throughout the time of Ward's and Hogan's joint business ventures and until the sale of Fountain Plaza in foreclosure of a deed of trust securing a $500,000 purchase and construction loan by the Bank of Jacomo.

The Fountain Plaza development is the focus of one of the main issues in this case. A considerable part (exactitude is beyond this record, or even close approximation) of the plaintiff corporations' money which Richard Hogan is charged with converting to his own use, and which the jury found he did convert to his own use, was spent in the construction of the Fountain Plaza building, and to service the $500,000 purchase and construction loan on the land and building.

Hogan did not deny that he used plaintiff corporations' money on the Fountain Plaza project, but it was his position that the Fountain Plaza project was a joint project of his and Ward's, and that his use of the plaintiff corporations' money was with Ward's knowing acquiescence. Hogan treated Ward's acquiescence as the acquiescence of the three corporations. The transfer of title to the Fountain Plaza property from the Hogans to Antares was never done, but Hogan expected to transfer the land title to Antares, or otherwise to reflect Ward's ownership interest, at the time the construction loan was converted to permanent financing. Hogan was unable to secure permanent financing, however, and ultimately the Bank of Jacomo foreclosed the $500,000 purchase and construction loan. The foreclosure sale of the Fountain Plaza tract yielded no excess over the amount of the loan.

Ward claimed he had no interest in the Fountain Plaza project, and testified he did not acquiesce in the use of the plaintiff corporations' money for the project.

In 1988 Ward and Hogan divided their holdings by agreement. Hogan relinquished all his interest in the three plaintiff corporations and the Duncan Road land. Hogan for his share took PDQ Flicks.

After Ward came into sole ownership of the plaintiff corporations (through ownership of all the stock of Antares), his daughter went through the canceled checks and came up with a list of checks by which, plaintiffs alleged, Hogan had misappropriated and converted plaintiff corporations' funds to his own use. The daughter testified that, from the three corporations, Hogan had received "either directly or indirectly or through money he paid to his mother-in-law or through money that he paid out on the Fountain Plaza project or just miscellaneous expenses like his dental bills" a total of $461,501.61. Ward during the same period had received $39,127.52. It may be that the exhibits would identify the respective corporations from which the funds came, but the parties have not filed their exhibits here.

■■■ The issue upon which the judgment must be reversed and the case remanded for a new trial is the court's refusal of an instruction offered by the defendants Hogan, patterned after MAI 32.26, which submitted to the jury the issue of plaintiffs' consent to what plaintiffs characterize as defendants' misappropriation of funds. A plaintiff's consent to defendant's exercise of dominion over property, claimed by plaintiff to have constituted conversion, is a defense to a claim of conversion. *Maples v. United Sav. & Loan Ass'n*, 686 S.W.2d 525 (Mo.App.1985). If there is evidence to support a hypothesis of plaintiff's consent, defendant is entitled to have the issue submitted to the jury.

As noted above, the Fountain Plaza land had been acquired by the Hogans before the formation of Antares and before Ward and Hogan commenced their joint business ventures. The land had been acquired with $200,000 of the proceeds of a $500,000 loan from the Bank of Jacomo. The remaining

$300,000 was a construction loan, to be used for the construction of a multi-purpose building on the land.

Among the checks written by Hogan from Antares and L & W accounts were checks amounting to $293,842.05 which appeared clearly to be related to the Fountain Plaza project. They were the following: To Bank of Jacomo, $87,586.04; to Giro Construction, general contractor building the Fountain Plaza building, $90,930.00; for construction materials, $115,326.01.

Hogan testified that he and Ward had agreed that Antares would acquire the Fountain Plaza project. Hogan expected that transfer of legal title from himself and his wife to Antares would take place at the time permanent financing was arranged.

There was some circumstantial evidence to support Hogan's thesis that Ward considered himself a participant in the Fountain Plaza project. Ward moved the Ward–Garrison offices from Sugar Creek to offices in Fountain Plaza and occupied them for several months without paying rent. When the cost of the building exceeded the amount of the construction loan, Hogan and Ward discussed using Antares funds to complete the building. Ward did not object. Ward and Hogan counselled together about the carpet selection for the upstairs of the Fountain Plaza Building. An engineer by the name of Rod Stuck, an employee of Antares, took over the supervision of the project, and maintained an office in Fountain Plaza. He testified he considered both Hogan and Ward his supervisors. Hogan and Ward during this time both had offices in Fountain Plaza. Stuck testified to meetings about Fountain Plaza at which both Hogan and Ward were present. Hogan testified he discussed with Ward the purchase of construction supplies.

Without going into greater detail, it will be seen that there was a good deal of evidence to indicate Ward acted in a proprietary way toward the Fountain Plaza project, and that he was fully cognizant of the expenditure of Antares and L & W funds on it.

It is unnecessary to detail the other expenditures which plaintiffs claim were a conversion of their moneys by Hogan. A substantial portion of such expenditures were payments made directly to Hogan. Hogan testified that most payments were for compensation to himself for services to the corporations, and that Ward knew of them and acquiesced in them. Other payments were reimbursements for expenditures made by Richard or Sharon Hogan for PDQ Flicks or one of the other plaintiff companies.

The consent of the plaintiffs furnishes a defense to an alleged conversion. *Graves v. Stewart*, 642 S.W.2d 649 (Mo. banc 1982); *Maples*, 686 S.W.2d 525. The consent of Hogan and Ward to the use of the funds of Antares, L & W Engineering, and McKinney–Baker was, or could have been found by the jury to be, the consent of the corporations. Hogan and Ward were the sole shareholders of Antares, which in turn was the sole stockholder of the other two corporations. The business of the corporations was under their sole discretion and management. See *Federal Savings & Loan Ins. Corp. v. First Nat'l Bank*, 164 F.2d 929, 934 (8th Cir.1949); *Kann v. Keystone Resources, Inc.*, 575 F.Supp. 1084 (W.D.Penn.1983). Consent of the plaintiff corporations, if found by the jury, would have furnished a defense against the conversion claim. Because the trial court erred in refusing the instruction on consent, we remand for a retrial.

Since it will be an issue in another trial, we take up another issue raised by appellants. Appellants claim their misappropriation of the plaintiff corporations' money, if it was misappropriation, did not amount to a conversion, and the court erred in submitting the case on a conversion instruction. In this, appellants are correct. To misappropriate money is ordinarily not conversion. It may in some limited circumstances constitute conversion; if the money has been entrusted to defendant for a specific purpose, and he diverts the money to another and unauthorized use, that may be conversion. Representative cases are the following: *Dillard v. Payne*, 615 S.W.2d 53 (Mo. banc 1981) (money given to attorney to be held in trust account for expenses in connection with plaintiff's suit); *Biermann v. Gus Shaffar Ford*, 805 S.W.2d 314 (Mo.App.1991) (money given to

a car dealer as a down payment on a specific used car); *Lappe & Assoc., Inc. v. Palmen,* 811 S.W.2d 468 (Mo.App.1991) (money given to defendant to invest after the defendant told the plaintiff about a "great opportunity"); *Boyd v. Wimes,* 664 S.W.2d 596 (Mo.App.1984) (money homeowner paid expecting it to be placed in escrow account and used for taxes and insurance); *Brandhorst v. Carondelet Sav. & Loan Ass'n,* 625 S.W.2d 696 (Mo.App.1981) (money paid to defendant as mortgage payment). Plaintiffs attempt to bring their case within that exception, saying that the money appropriated by the Hogans was held for "general corporate purposes," and was diverted by Hogans to their personal use.

The Missouri cases strongly tend against such an enlargement of the exception to the rule that money is not subject to conversion. We hold, on the basis of the following cases, that money held for "general corporate purposes" is not money held for a specific purpose which may be subject to conversion: *Gaffney v. Community Federal Sav. and Loan Ass'n,* 706 S.W.2d 530 (Mo.App.1986) (Money in a bank account can not be the subject of a conversion suit which alleges unauthorized withdrawals from an automatic teller machine); *Breece v. Jett,* 556 S.W.2d 696 (Mo.App.1977) (Money in a joint bank account can not be converted by someone whose name is on the account); *R.H. Kobusch Furniture & Carpet Co. v. Loewenberg,* 194 Mo.App. 551, 185 S.W. 747 (Mo.App.1916) (Money taken from a corporate account through checks written by defendant could not be subject of conversion suit).

We have not rested our reversal of the judgment on the erroneous submission of conversion because of the possibility that, even if the conversion submission was not supported by the evidence (as we have held it was not), the judgment might still be affirmed as to actual damages. The ground for such an affirmance would be that the facts necessarily found under a conversion submission would include all the facts necessary to be found in a money had and received submission, and the judgment could be affirmed as to actual damages as one for money had and received, notwithstanding the erroneous submission. See *Gaffney,* 706 S.W.2d 530. Since, as we explain in the next paragraph, such a treatment would not dispose of the case, we elect to postpone the issue to another case which presents it cleanly.

Even if we could, on the above-explained reasoning, treat the judgment as one for money had and received, reversal would still be necessary because of the erroneous refusal of the consent instruction. Plaintiff's consent may be a defense to a money had and received claim, as well as to a conversion claim. See *Federal Sav. & Loan Ins. Corp. v. First Nat'l Bank,* 67 F.Supp. 207 (D.C.Mo.1946), *aff'd* 164 F.2d 929 (D.C.Mo.1947). "The action (for money had and received, or assumpsit) is one that involves equitable principles and the defendant may interpose any defense that shows the plaintiff in equity and good conscience not entitled to recover." *Federal Sav. & Loan Ins. Corp.,* 67 F.Supp. at 209 (citations omitted).

Judgment reversed and cause remanded for a new trial.

All concur.