RAMSAY SCARLETT AND COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
BALTIMORE STEVEDORING COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3433–70, 3434–70. Filed March 25, 1974.

*Jacques T. Schlenger*, *Theodore W. Hirsh*, and *Harry D. Shapiro*, for the petitioners.

*John J. Weiler*, for the respondent.

FORRESTER, *Judge:* In these consolidated cases respondent has determined the following deficiencies in petitioners' Federal income taxes:

| Petitioner | Taxable year | Deficiency |
|---|---|---|
| Ramsay Scarlett & Co., Inc. | 1962 | $89, 796. 12 |
| | 1963 | 71, 419. 48 |
| | 1964 | 79, 862. 26 |
| | 1965 | 115, 652. 43 |
| | 1966 | 80, 590. 01 |
| | 1967 | 8, 060. 83 |
| | 1968 | 31, 684. 98 |
| Baltimore Stevedoring Co. | 1965 | 202, 129. 11 |

Because of concessions, the only issue remaining for our decision is whether the petitioners are entitled under section 165(e)[1] to claim deductions in 1965 for theft losses resulting from embezzlements of corporate funds.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Ramsay Scarlett & Co., Inc. (Ramsay), is a Maryland corporation which had its principal office in Baltimore, Md., at the time the petition herein was filed. For each of its taxable years involved in the instant case, Ramsay filed Federal income tax returns on

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

a calendar year basis with the district director of internal revenue, Baltimore, Md.

Petitioner Baltimore Stevedoring Co., Inc. (Stevedoring) is also a Maryland corporation which had its principal office in Baltimore, Md., at the time it filed its petition herein. Stevedoring filed its 1965 calendar Federal income tax return with the district director of internal revenue, Baltimore, Md.

The petitioners are closely affiliated. Charles Scarlett, Jr. (Charles), and his immediate family, and William D. G. Scarlett (William) and his immediate family each own 50 percent of the outstanding shares of both companies. William was the president of both corporations and Charles the executive vice president. In addition the petitioners shared the same office facilities and employees.

During the taxable year 1965, and for many years prior thereto, Ramsay was engaged in the business of acting as a ship's agent for ships docking at the Port of Baltimore. When a ship arrived in the port, it was Ramsay's duty to pay for any "arrival expenses" which the ship might incur. Such expenses, which included the fees required in order for the ship to be allowed to enter the port, ranged from less than $100 to several thousand dollars depending on the vessel involved. Ramsay would pay such expenses for the ship by writing a check on Ramsay's agency account with the Equitable Trust Co. (Equitable) in Baltimore. In addition, Ramsay was expected to advance cash to the masters of the vessels for other expenses, such as the salaries of the crew members. In approximately 55 percent of the dockings in which Ramsay was involved between 1962 and 1964, less than $1,500 in cash advances were required by the masters; in approximately 85 percent of the dockings, the amount was less than $5,500, although on a very few occasions, the amount required was in excess of $50,000. The following table summarizes the amounts of arrival expenses and cash advances to masters which Ramsay paid out in the years 1962, 1963, and 1964: [2]

| Year | Cash to masters | Other arrival expenses | Total |
|------|-----------------|------------------------|-------|
| 1962 | $545,273.23 | $243,009.56 | $788,282.79 |
| 1963 | 680,355.30 | 234,439.61 | 914,794.91 |
| 1964 | 954,504.86 | 255,264.89 | 1,209,769.75 |

Except for two occasions between 1962 and 1964, all cash advances in excess of $10,000 were delivered to the masters by Brinks, Inc. (Brinks). For such $10,000 advances, when handled by Brinks, Ram-

---

[2] Figures for 1965 were not shown for these expenses. As to other types of expenses and receipts to be mentioned below, we will indicate the 1965 figures where available.

say would write a check on its agency account and make it payable to Equitable. William L. Lampe (Lampe), the treasurer of both petitioners, or Howard Raley (Raley), one of petitioners' bookkeepers, would call ahead to Equitable to inform it of the Brinks' pickup. On most occasions, it would be Raley who would then deliver the check to a teller at the bank, who would cash the check, and hold the proceeds for the Brinks' representative. The Brinks' representative would then pick up such proceeds from a teller at a special teller's window in the bank. On those occasions when an employee of Ramsay would make the delivery to the master, the cash was obtained from a safe located in one of Ramsay's offices.[3] For years it had been standard procedure at Ramsay to replenish the cash contained in such safe by having an employee write a check on the agency account payable to an individual—Lampe in the vast majority of cases, one of the Scarletts or Raley on a few occasions—and having such individual endorse it in blank. The check was then taken to Equitable by a Ramsay employee— normally Raley during the 1962 to 1965 period—where the check was cashed, and the proceeds then returned to the cash drawer in the safe. The largest check of this type which was cashed during the 1962–65 period was one on July 23, 1962, for $18,300, payable to Lampe. The vast majority of such checks, however, were for less than $10,000. The average amount of such checks cashed each month at Equitable was approximately $40,000. As required by Ramsay's insurer, a Ramsay employee was not permitted to carry more than $5,000 on his person at any time. Thus, if a check for more than $5,000, payable to an individual, had to be cashed, two or more Ramsay employees would go the bank, or else one employee would make several pickups.

In addition to taking care of arrival expenses and cash advances to shipmasters, Ramsay, as ship's agent, also provided funds for expenses a ship might incur while in the Port of Baltimore. Such expenses included charges for fuel and repairs, and for the loading and unloading of the vessel. During the 1962–64 period, Ramsay incurred approximately $4 million of such expenses each year. After performing all of such services for the vessel, Ramsay would proceed to settle its account with the ship owner.

During the taxable year 1965, and for many years prior thereto, Stevedoring was engaged in the business of providing stevedoring services to ships docking at the Port of Baltimore. During the 1962–65 period, a substantial portion of Stevedoring's business involved those vessels for which Ramsay acted as ship's agent, although Stevedoring also furnished services to other vessels.

---

[3]

|  | 1962 | 1963 | 1964 |
|---|---|---|---|
| Total cash to masters | $541,273.23 | $680,355.30 | $954,504.86 |
| Delivered by: |  |  |  |
| Brinks | 364,992.96 | 344,240.00 | 509,807.18 |
| Ramsay employees | 176,280.27 | 336,115.30 | 444,697.73 |

On September 27, 1965, Ramsay was informed by Equitable that its agency account at that bank was overdrawn. On the same day, Stevedoring was informed by the Mercantile-Safe Deposit & Trust Co. (Mercantile) that its account with that bank was also overdrawn. Lampe immediately examined the books of both companies on September 27, and determined that Raley had embezzled substantial sums of money from petitioners. The same day, upon being called in by the officers, Raley admitted that he had been embezzling corporate funds from both companies.

In October 1965, petitioners asked their accountants of long standing, the firm of Wooden, Benson & Walton (Wooden & Benson), to make a determination of the exact amounts of the thefts. On November 15, 1965, Wooden & Benson presented a detailed report to Stevedoring outlining the methods Raley had used in making the embezzlements. The thefts from Stevedoring were found to have taken place in 1964 and 1965, and their total was reported as $433,000. On December 1, the accountants made a similarly detailed report to Ramsay, in which it was reported that Raley had embezzled $1,084,279 from Ramsay between 1963 and 1965. The thefts were reported in net amounts, as it was determined that Raley made certain repayments to the petitioners out of his private funds. The net amounts of all such embezzlements are not in dispute in the instant case.

Raley had been working for petitioners as a bookkeeper since 1959. Before 1959 Raley had worked for Wooden & Benson, which had also been the former place of employment of Lampe. Raley had been a trusted employee of petitioners, and had been given a $6,000 bonus at one time in the early 1960's in order that he might be able to make a downpayment on a house he wished to purchase.

Basically, Raley accomplished his embezzlements by retaining the proceeds of corporate checks which he would cash at Equitable. The major part of the theft from Ramsay was accomplished by the cashing of two types of checks at Equitable. One such type consisted of checks written by the corporation on its agency account at Equitable, and made payable to the corporation. Proceeds of $232,700 from such checks were embezzled by Raley between December 10, 1963, and April 6, 1965.[4] The checks, 12 in all, varied in face amounts from $5,000 to $33,500, averaging almost $20,000 per check. All such checks were endorsed on the backs thereof by a rubberstamp:

Ramsay Scarlett & Co., Inc.
Agency Account Number 0571-168-0

---

[4] It is to be noted that as to several of the types of checks to be described, Raley did not embezzle the full face amounts thereof. In making our findings of fact, we have indicated only the amounts actually embezzled, as determined by the Wooden & Benson reports.

and by the signature of Raley beneath the stamped endorsement. On file at Equitable at all relevant times were certificates of authority from Ramsay covering both the agency and regular accounts, which provided, in part, that—

any one of the following officers of the corporation, to wit: William D. G. Scarlett, William L. Lampe, Charles Scarlett, Jr., *acting conjointly* with any one of the following, to wit: J. Joseph Brune, Howard L. Raley, Rex Wheeler, Jr., are hereby authorized, (1) to draw and sign checks on the corporate account with the Equitable Trust Company, * * * (3) to discount with said Trust Company any bills receivable or negotiable paper belonging to this corporation, and to endorse or guarantee the same in the name of this corporation * * * [Emphasis supplied.]

Raley had himself purchased the stamp which he used to endorse the group I checks. While such purchase was made without any permission from a Ramsay officer, Lampe knew that Raley had the stamp. Lampe was told by Raley, however, that he was using the stamp only to endorse checks which shipmasters and other vessel employees would bring to Ramsay to have cashed. Such checks would be payable to the individual presenting the check to Raley. Raley would have such individual endorse the check in blank, and would then stamp the check with the agency account endorsement described above. Cash would be given to the ship employee from Ramsay's cash drawer, and Raley would then cash such check at Equitable and place the proceeds back in the drawer. It does not appear that the face amount of such checks ever exceeded $100.

Group I type checks had been used in the past by Ramsay in order to transfer funds from the agency to the regular account. Such transfers would occur, normally about 10 times a year, when Lampe would notice that the balance in the general account [5] with Equitable was below $50,000. It does not appear that checks of this type, except for those whose proceeds Raley embezzled, were ever before cashed by Ramsay employees at Equitable, or at any other bank.

The other type of check which Raley used to accomplish his defalcations from Ramsay were checks drawn on the agency account and payable to Equitable (group II checks). Between December 16, 1963, and September 15, 1965, Raley embezzled $737,000 in proceeds from such checks. The checks ranged in amounts from $8,000 to $38,500,[6] and averaged about $30,000 per check. Approximately $700,000 of the embezzlements from such checks occurred during the first 9 months of 1965, $180,000 in the month of June alone. One group II check, dated April 27, 1965, was signed by only one Ramsay representative. Raley embezzled $30,000 of the proceeds of this check.

[5] Ramsay's general account contained the profits from operations, together with funds needed for normal operating expenses.
[6] Only $30,000 from this check was actually embezzled.

In past practice, group II checks had been utilized for numerous purposes. As described above, they were used when Brinks was to pick up the funds at the bank for delivery to a ship. Some time before the period upon which we are here focusing, Ramsay had made the checks payable to Brinks, but Equitable had requested that Ramsay make the check payable, instead, to the bank. Those group II checks utilized to provide funds for a Brinks' pickup would ordinarily have noted thereon the fact that the proceeds were to be delivered by Brinks to a particular vessel, the name of which was also on the face of the check. Accompanying each check would be a letter naming the ship to which delivery was to be made, and notifying the bank that the delivery was to be carried out by Brinks. Also sent to the bank together with the check were receipt forms which Brinks was to complete and return to Ramsay upon completing the delivery. In addition, group II checks were brought to Equitable when Ramsay had to make a wire transfer of funds to a principal, or when it wanted Equitable to draw a check payable to a principal on a New York bank. In none of these transactions was there involved the handing over of any cash to an employee of Ramsay. Three group II checks in 1963, in face amounts of $3,000, $4,000, and $5,000, were cashed by Raley at Equitable, and the proceeds thereof placed in the cash drawer. Such use of group II checks, however, as Raley was aware, was not in line with company procedure and past practice for the obtaining of cash.

In addition to his use of group I and group II checks, Raley embezzled $35,100 in proceeds from checks made payable to himself, and stole $11,000 outright from the cashbox. As to one check payable to Lampe, Raley obtained Lampe's signature and endorsement at a time when the check was only made out for $4,000. Subsequently, before cashing the check, Raley altered the amount to $34,000, and embezzled the additional $30,000. Finally, Raley appropriated $77,000 in proceeds from checks which could not be located by Ramsay and its accountants in their investigation of the thefts. The amounts of these checks were obtained from listing tapes at Equitable, but the type of checks involved could not be determined.

The thefts from Stevedoring also involved, for the most part, two type of checks. One type was checks drawn on Stevedoring's account at Mercantile, and made payable to Ramsay (group III checks). All but one of these checks were endorsed by the rubberstamp described above, with Raley's signature thereunder. An $18,000 check of this type, cashed at Equitable on January 30, 1964, did not bear the rubberstamp endorsement. Instead, Raley printed the agency account designation on the back of the check, with his signature thereunder. A $12,000 check dated December 9, 1964, was cashed with only one of

the two signature lines on it completed. Stevedoring, as was true in Ramsay's case, required two signatures for checks to be drawn on its bank accounts.

From group III checks, $400,500 in proceeds were embezzled by Raley in the period from January 27, 1964, to February 23, 1965. The checks ranged in face amount from $4,000 to $40,000, averaging $20,000 per check. All but $100,000 of such checks were cashed in 1964.

Petitioners had used such checks in the past in order to accomplish intercompany transfers between the corporate bank accounts. Such transfers represented loans from one of the companies to the other, repayments of such loans, or else the return of funds which one of the companies had received from a third party, but which actually belonged to the other. Such checks had not been cashed for employees of either corporation, and all indications are that Stevedoring, if it needed cash, followed Ramsay's policy of writing checks payable to individual employees.

Raley also embezzled $28,000 of proceeds from checks drawn on Stevedoring's account with Mercantile, and made payable to Equitable and not endorsed (group IV checks). The checks were dated between February 20, 1964, and March 20 of the same year. Stevedoring had been in the habit of using this type of check for purposes of withholding taxes, and pension plan contributions, and none of such checks, other than those the proceeds of which Raley embezzled, appear to have ever been cashed before for a Stevedoring employee.

Raley also embezzled a $4,500 Stevedoring check, dated February 14, 1964, payable to himself.

As the corporate bookkeeper, Raley had all the opportunities he needed to achieve his thefts. It was he who received and reconciled the monthly bank statements of the companies for many of the months during which the embezzlements occurred. He was also able to make book entries in the corporate journals to conceal his actions—as by inflating the amount of accounts receivable owned by petitioners. At the end of each of the years involved, Raley would simply kite checks from Ramsay to Stevedoring, and vice versa, an activity clearly facilitated by his knowledge of the type of audit that Wooden & Benson would perform, and by his handling of the bank account reconciliations. Furthermore, it does not appear that Raley's activities as bookkeeper were very closely observed by his immediate superior, Lampe.

Raley also had access to presigned checks which were kept in a safe at petitioners' offices. Because of the requirement for two signatures on all Ramsay agency and regular account checks, it was found to be convenient to leave several of these checks, with only one signature, and with the payee and amount designations blank, in the cash drawer

in Ramsay's safe since there were occasions when two authorized signers could not be located at the same time. On such occasions, the presigned checks, with one signature already thereon, made it possible for only one more of the authorized signers to draw money on the accounts if it was needed for some reason. While it is clear that some of Raley's defalcations involved such presigned checks, the record does not establish what amount, or even what approximate amount of the embezzlements, involved the use of presigned checks.

The company accountants made only a partial audit of Ramsay's and Stevedoring's books each year, the major purpose of their work being to prepare Federal income tax returns for each of the companies. These audits did not encompass procedures which could uncover the kiting operations Raley performed at the end of each year. While Wooden & Benson had several times in the past requested that it be allowed to do a more thorough audit of the books, William and Charles had refused to give such authorization, both because of the higher costs involved and because they felt the current system which placed the major responsibility for checking the books on their own employees was adequate.

The embezzlements were a serious financial blow to both petitioners. Immediately upon the discovery of the thefts and their approximate extent on September 27, 1965, first priority was given to obtaining funds to keep the companies in operation. Equitable was approached, and with the personal assets of the officers and their wives pledged as security, the bank opened a $300,000 line of credit in favor of petitioners. Later that year both Ramsay and Stevedoring recovered on surety bonds covering Raley, Ramsay recovering $35,730 and Stevedoring $14,270. It appears that these recoveries exhausted the respective coverages under the bonds. Both companies also hoped that they would be allowed to claim the thefts as losses on their income tax returns, as this would bring them substantial refunds because of carry-backs to previous years.

Recovery against the embezzler himself did not appear likely. Raley, who pleaded guilty to all the thefts described above, and was then sentenced on December 30, 1965, to six consecutive 10-year terms in prison, had used the embezzled funds to support a sizable gambling habit. Ramsay hired private investigators to examine into Raley's finances and to attempt to locate any of the embezzled funds. By the end of 1965, however, it was apparent that all such efforts would be fruitless. On September 29, 1965, Raley's wife, Katherine, delivered to Ramsay certain stock certificates, apparently owned by her and Raley. A notice of Federal tax lien, however, was filed against Raley on March 8, 1967, and Ramsay was sent a notice of such levy that

same day. Subsequently, the United States instituted suit against Ramsay and others to recover such stock certificates, and that suit is currently unresolved. At the close of 1965 the approximate fair market value of the shares represented by the delivered certificates was between $7,200 and $8,000. However, probably in light of the clear likelihood of the Federal action, neither party in this case has claimed that such stock certificates should be judged to have reduced petitioners' losses as of the close of 1965.

Petitioners' most prolonged efforts at recouping the funds embezzled by Raley were directed toward possible claims against Equitable, where all the checks involved in the theft were cashed. Soon after the discovery of the defalcations, Nicholas Penniman III (Penniman), petitioners' general counsel since 1937, sought advice from Fulton Bramble (Bramble), an attorney specializing in negotiable instruments law as to any third-party claims which petitioners might have. Penniman prepared a list of the embezzled checks for Bramble and orally described to him petitioners' check-cashing procedures and the methods by which Raley had carried out the thefts. At the time such opinion was sought, Penniman realized, as did the other officers of petitioners, that neither he nor Bramble could represent petitioners in any actions against Equitable because Equitable was a client of the law firm of which both Bramble and Penniman were partners.

Sometime in late 1965 or early 1966, Bramble informed Penniman that it was his opinion that as to all but one of the checks involved, petitioners' chances of recovery against either Equitable or Mercantile were very poor.[7] The sole exception was the group III check, dated December 9, 1964, which was cashed with only one authorized signature thereon. Mercantile, on some undetermined date between 1965 and 1967, agreed to reimburse Stevedoring for such check.

In November of 1965, Ramsay and Stevedoring retained Melvin J. Sykes (Sykes), a Baltimore attorney experienced in lengthy and complicated litigations, to represent them as to any possible claims existing against third parties. Sykes was recommended to petitioners' officers by Penniman and others as the lawyer who could probably gain a recovery from the banks. Upon being retained, Sykes commenced research into the law in the area of claims against banks. Ramsay immediately notified Equitable that such an investigation was proceeding.

In the spring of 1966, with Sykes still involved in the research, the boards of directors of petitioners decided to file suit against Equitable on the checks, it being their apparent opinion that Equitable was the party from which a recovery was most likely. In July of 1966,

---

[7] Bramble died in 1969, before the trial of the instant case.

because of the close relationships existing between members of the boards of directors of petitioners and Equitable,[8] copies of declarations in the proposed suit were presented to Equitable by petitioners, prior to any formal filing of the suit in court. Equitable immediately forwarded copies of such declarations to its insurance company, New Amsterdam Casualty (New Amsterdam). At the request of Equitable, petitioners delayed the filing of the proposed suit, and it was agreed among the parties to extend the statute of limitations to May 1, 1967, as to any claim existing on October 28, 1966. Finally, on April 20, 1967, Ramsay and Stevedoring filed suit against Equitable in the Superior Court of Baltimore City. The suit sought a recovery of approximately $1,400,000 of the embezzled proceeds.

Before the suit was filed there had been discussions of settlement among Sykes, William L. Marbury, who represented Equitable, and B. Conway Taylor, who represented New Amsterdam. Sometime in early 1967, Sykes offered to settle for $750,000, an offer which was rejected by both Taylor and Marbury. Upon such rejection, Sykes asked Laurence Katz, a professor at the University of Maryland Law School who specialized in negotiable instruments law, to assist in preparation of the case. Katz agreed, and proceeded to analyze the facts of the case in light of the relevant Maryland statutory provisions.

From April 1967 through early 1969, interrogatories and depositions were taken by all parties to the then-pending action. In August of 1969, the suit was removed from the Superior Court in Baltimore to the Circuit Court for Cecil County. Finally, in December of that year, after the parties had filed their pretrial memoranda with the court, the case was settled, with Equitable paying petitioners $475,000.

Petitioners never filed a court suit against Wooden & Benson, although petitioners and Wooden & Benson did agree to extend the statute of limitations on any possible claim against the accountants until the suit against Equitable was resolved. When such suit was settled in 1969, Wooden & Benson paid petitioners $25,000 in settlement of any claim petitioners might have against them. Under the terms of the settlement agreement, however, the accountants did not admit any liability for the defalcations.

No suit was ever brought against Mercantile. However, pursuant to the agreement between Stevedoring and Mercantile as to the $12,000 group III check described above, Mercantile paid Stevedoring $9,000 on such check. This figure was arrived at by allocating 25 percent of the face amount of such check to the recovery from Equi-

---

[8] John D. Luetkemeyer, the president of Equitable, was a member of the board of directors of both petitioners, and a close personal friend of the Scarletts. For several years prior to Raley's defalcations, William served as a member of the board of directors of Equitable.

table, with Mercantile paying the difference. In allocating the recoveries provided for under the agreements with Equitable and Wooden & Benson, $357,310.70 was allocated to Ramsay and $142,689.30 to Stevedoring. This allocation was based on the proportionate dollar amounts embezzled by Raley from each such corporation.

On its 1965 Federal income tax return Ramsay claimed a deduction of $1,048,549, for losses sustained as a result of Raley's thefts. This figure was arrived at by subtracting Ramsay's 1965 recovery on the surety bond, which was $35,730, from $1,084,279, the total thefts from Ramsay. In his statutory notice of deficiency, respondent disallowed such claimed deduction for 1965 in full.

In its 1965 return, Stevedoring deducted $418,730 as losses arising from Raley's thefts. Such figure was arrived at by subtracting Stevedoring's 1965 surety bond recovery of $14,270, from the total thefts from Stevedoring of $433,000. In his statutory notice of deficiency respondent disallowed such deduction in full for 1965.

On brief, respondent has taken the position that the proper year for the deduction of any theft losses is 1969, the year during which the settlements took place.[9]

OPINION

In 1965, petitioners Ramsay Scarlett and Baltimore Stevedoring discovered that their mutual bookkeeper had embezzled approximately $1.5 million from the two companies. The only issue for our decision is whether the petitioners are entitled, under section 165(e), to a deduction in 1965 for losses resulting from such thefts. It is respondent's position that a deduction is not properly allowable in 1965, because in that year petitioners had a reasonable prospect of recovering on claims against third parties arising out of the thefts. Respondent relies chiefly on section 1.165-1(d)(3), Income Tax Regs.:

> Any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss (see § 1.165-8, relating to theft losses). However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascer-

---

[9] As to the four groups of checks described above, the following indicates the amounts of embezzlements on checks drawn and paid before and after Feb. 1, 1964, which was the effective date of the Uniform Commercial Code in Maryland. Md. Ann. Code art. 95B, tit. 10–101 (1957).

|  | *Pre-2/1/64* | *Post-2/1/64* |
|---|---|---|
| Group I | $48,200 | $184,500 |
| Group II | 23,000 | 714,000 |
| Group III | 25,000 | 375,000 |
| Group IV | ---- | 28,000 |

All other checks which were utilized by Raley in his embezzlements were drawn and paid after Feb. 1, 1964.

tained with reasonable certainty whether or not such reimbursement will be received.

Petitioners' initial response to respondent's position is that the existence of a reasonable prospect of recovery in 1965 does not affect their entitlement to a theft loss in the full amount claimed for that year. It is their contention that Congress, in section 165(e),[10] explicitly established that the only year in which a theft loss deduction may be claimed is the year in which the theft is discovered by the taxpayer. Thus, it is argued, respondent's regulation, which provides that a theft loss is deductible in a year other than that of discovery if there exists a reasonable prospect of recovery, is inconsistent with the express language of the statute, and hence invalid. We reject petitioners' argument, and uphold the validity of section 1.165–1(d)(3), Income Tax Regs.

It has been a constant doctrine in revenue matters that before a loss may be claimed as a deduction, it must be evidenced by a closed or completed transaction. *United States* v. *White Dental Co.*, 274 U.S. 398, 401 (1927); *Boehm* v. *Commissioner*, 326 U.S. 287, 291 (1945). Those of respondent's regulations which have posited a "closed and completed transactions" test for deduction have been in existence so long, and through so many reenacts of the statute, that they have come to possess the "effect of law." *Boehm* v. *Commissioner*, *supra* at 291–292. One of the essential inquiries under the "closed transaction" concept has been whether, in the year the deduction is sought, there existed a substantial possibility that the alleged losses could be recouped by actions against responsible third parties or otherwise. *Boehm* v. *Commissioner*, *supra* at 294–295; *Scofield's Estate* v. *Commissioner*, 266 F. 2d 154, 158 (C.A.6, 1959), affirming and reversing and remanding in part 25 T.C. 774 (1956); cf. *United States* v. *White Dental Co.*, 274 U.S. at 402–403; *Commissioner* v. *Harwick*, 184 F. 2d 835 (C.A. 5, 1950), affirming a Memorandum Opinion of this Court. Where such a prospect of recovery has been found to exist in the year in which either the Commissioner or a taxpayer has argued that a loss is deductible, such year was held not to be the proper one in which to claim the loss. *Lewellyn* v. *Elec. Reduction Co.*, 275 U.S. 243, 246–248 (1927); *Scofield's Estate* v. *Commissioner*, *supra* at 159, 163; *Foundation Co.*, 14 T.C. 1333, 1353–1354 (1950).

Petitioners do not contend that the above is an incorrect description of the pre-1954 Code law on loss deductibility. However, it is their

---

[10] SEC. 165. LOSSES.

(e) THEFT LOSSES.—For purposes of subsection (a), [subsec. 165(a) provides that losses sustained during the taxable year are deductible, if "not compensated for by insurance or otherwise"] any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

position that Congress, in section 165 (e) intended to render irrelevant in the case of theft losses any consideration of prospects of recovery under traditional "closed transaction" principles. They contend that Congress established the year in which the theft or embezzlement is discovered as the one and only year in which the losses resulting from such theft may be deducted.

We cannot agree with this position. In the first place, section 165 (e) speaks of the year in which the "loss" is discovered—not the year in which the "theft" is discovered—as being the proper year for the loss deduction. It was recognized, prior to the passage of the 1954 Code, that a "theft" and the "loss" resulting therefrom are not synonymous terms:

Furthermore, the terms embezzlement and loss are not synonymous. The theft occurs, but whether there is a loss may remain uncertain. One whose funds have been embezzled may pursue the wrongdoer and recover his property wholly or in part. * * * [*Alison* v. *United States*, 344 U.S. 167, 170 (1952).]

Thus, it can be argued that the very language of section 165 (e) does not support petitioners' interpretation.

More substantially, it is quite clear that Congress enacted section 165 (e) to deal with a specific problem relating to theft, and especially embezzlement losses. Under the 1939 and prior Codes, theft losses were handled together with all other types of losses under general language very similar to that contained in the present section 165 (a) :

SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year * * *

See also sec. 23 (e), (f), 1939 Code; sec. 23 (e) and (f), Revenue Acts of 1938, 1936, 1934, 1932, 1928; sec. 214 (a) (4) and (5), 234 (a) (4), Revenue Act of 1926. Under the earlier Code sections, the Commissioner had often taken the position that embezzlement losses are sustained when they occur, i.e., when the embezzlement actually takes place. See discussion in *Asphalt Industries, Inc.* v. *Commissioner*, 411 F.2d 13, 15 (C.A. 3, 1969). The practical result of such position was that a taxpayer would be denied loss deductions if he did not discover the embezzlements until after the running of the Federal income tax statute of limitations as to the years in which the embezzlements had occurred. In addition, because of the frequently long-term concealment of the thefts by the embezzler, it might be difficult for the taxpayer to fulfill his burden of proving in exactly which years the embezzlements had actually occurred, thus again resulting in the loss of a deduction.

The above-described position of the Commissioner was upheld in *First Nat. Bank of Sharon, Pa.* v. *Heiner*, 66 F.2d 925 (C.A. 3, 1933), and the taxpayer was thereby denied deductions for losses resulting

from embezzlements which had occurred before the year of discovery. Another court, while not having to reach such issue, strongly indicated that it would sustain the Commissioner's position despite the resultant loss of a deduction because of the statute of limitations. *Borden* v. *Commissioner*, 101 F.2d 44, 45 (C.A. 2, 1939), affirming a Memorandum Opinion of this Court. The Court of Appeals for the First Circuit, however, pointing to, among other factors, the harsh and unfair consequences flowing from the Commissioner's position, allowed the deductions to be taken in the year in which the defalcations were discovered. *Boston Consol. Gas Co.* v. *Commissioner*, 128 F.2d 473, 475–476 (C.A. 1, 1942), reversing on this issue 44 B.T.A. 793 (1941). This Court later followed the reasoning and approach of *Boston Consol. Gas Co.* in *Gwinn Bros. & Co.*, 7 T.C. 320, 324–325 (1946). In none of these cases was there involved the issue of whether, having once discovered the loss, the taxpayer was yet precluded from taking an immediate deduction due to reasonable prospects of recovery. No such reasonable prospect was apparent in any of these cases.

Confronting this split in authority, the Supreme Court of the United States in *Alison* v. *United States, supra,* held that in the two situations there before it, the loss was properly deductible in the year in which the embezzlement was discovered. In one of the situations, the taxpayer was unable to determine from his books the years in which the embezzlement had occurred; in the other, the embezzlements were found to have occurred over a prior 10-year period. As to the latter situation, the Court made no specific reference to the statute of limitations problem. Instead, the Court spoke of "hardships and injustice," and held that the "special factual circumstances involved" compelled it to allow a deduction in the year in which all the embezzlements were discovered. *Alison* v. *United States*, 344 U.S. at 169–170. Again, as in the earlier cases, the question of prospects of recovery was not before the Court. The Commissioner later announced that he would follow *Alison* in cases in which either (1) it would be "impossible" to determine the actual years in which the embezzlements took place, or (2) because of the success of the embezzler in concealing his activities, the embezzlements took place over a period of years, and "the facts reveal that undue hardship or injustice would result if the loss were allowed only in the years the embezzlements occurred." Rev. Rul. 183, 1953–2 C.B. 143. It was not stated explicitly, however, in either *Alison* or Rev. Rul. 183, that forfeiture of deductions because of the running of the statute of limitations would be sufficient in itself to require that the loss be deducted in the year the theft was discovered, or if additional circumstances would have to be shown.

Thus, in 1954, when Congress turned its attention to theft losses, it

was confronting an area in which the litigation over the prior two decades had been dominated by the issue of whether taxpayers could be deprived of loss deductions because of their failure to have discovered the thefts or embezzlements, and the amounts thereof, in the years in which they had actually occurred. While the Supreme Court in *Alison* v. *United States, supra,* had done much to assist taxpayers caught in the situation of prolonged and secretive embezzlement, there were still lingering doubts in the area, especially as to whether the running of the statute of limitations would always give the taxpayer the opportunity to claim his deduction in the later year. We think it was to quiet any doubts existing after *Alison,* and to give unequivocal support to the doctrine espoused in that case, that Congress passed section 165(e). Comments in the Senate and House committee reports indicate that it was this concern with the loss of deductions due to prolonged concealment that caused Congress to act as it did:

> The regulations under present law indicate that generally ordinary losses can be taken only in the year in which they are sustained. *In embezzlement and other theft losses, however, the taxpayer may not find out about the loss until the statute of limitations has run for the year in which the loss was incurred.*

> \*          \*          \*          \*          \*          \*          \*

> Subsection (e) is a new provision for the treatment of theft losses. There was no comparable statutory provision in the 1939 Code. Regulation 118, section 39.43-2 provides that a loss from theft or embezzlement is ordinarily deductible for the year in which sustained. There has been considerable uncertainty and litigation about the application of this rule. Under the new provision, the loss will always be deductible in the year in which the taxpayer discovers the loss. \* \* \* [H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 21, A46 (1954) ; emphasis supplied; S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 23, 198 (1954).]

Petitioners, however, would have us view section 165(e) as not only freeing a taxpayer from the necessity of showing when an embezzlement actually took place, but as also allowing taxpayers deductions despite very arguable rights of recovery against third parties in the year the thefts are discovered. This we decline to do. To so view the statute, we think, would require us to ascribe to Congress the intent to make theft losses more easily deductible than other types of losses, which were and remain subject to the reasonable prospect of recovery analysis. *Louis Gale,* 41 T.C. 269, 273-277 (1963) (fire losses) ; *United States* v. *White Dental Co.,* 274 U.S. at 402-403; *Fuchs* v. *Commissioner,* 413 F.2d 503, 506-508 (C.A. 2, 1969), affirming a Memorandum Opinion of this Court (expropriation losses) ; *Lewellyn* v. *Elec. Reduction Co.,* 275 U.S. at 247-248; *Glenn* v. *Louisville Trust Co.,* 124 F. 2d 418, 420 (C.A. 6, 1942) (losses for and from breach of contract). Petitioners give us no grounds to support the existence of such an intent, and none are apparent. As we have stated above, we think the congres-

sional intent in enacting section 165(e) was rather to make deductions for theft losses as readily available as deductions for other types of losses, by neutralizing the discovery problems unique to the case of theft and embezzlement losses. We cannot find in the congressional action any intent to make irrelevant in theft loss cases the traditional closed transaction analysis, which includes the consideration of prospects of recovery. Since the language of the section—which speaks in terms of "losses" and not "thefts"—clearly does not require us to give effect to any such further alleged congressional intent, and since we do not think that Congress, in light of the prior litigation and the legislative history, in fact had such intent, we decline to adopt petitioners' reading of the statute.

Treasury regulations must be upheld "unless unreasonable and plainly inconsistent with the revenue statutes and * * * should not be overruled except for weighty reasons." *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501 (1948). In light of the absence of such "weighty reasons" for disregarding section 1.165–1(d)(3), Income Tax Regs., we find such regulation to be valid under the statute.[11]

Having found that section 1.165–1(d)(3), Income Tax Regs., prescribes the standard under which we must determine petitioners' claims for a loss deduction in 1965, our next and final inquiry is whether, at the close of 1965, there existed a "claim for reimbursement with respect to which there * * * [was] a reasonable prospect of recovery." Sec. 1.165–1(d)(3), Income Tax Regs. A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor. *Scofield's Estate* v. *Commissioner*, 266 F. 2d at 159; *Foundation Co.*, 14 T.C. at 1351, 1354. The standard for making this determination is an objective one, under which this Court must determine what was a "reasonable expectation" as of the close of the taxable year for which the deduction is claimed. *Scofield's Estate* v. *Commissioner, supra* at 163; *Parmelee Transportation Co.* v. *United States*, 351 F. 2d 619, 628 (Ct. Cl. 1965). The situation is not to be viewed through the eyes of the "incorrigible optimist," and hence, claims for recovery whose potential for success are remote or nebulous will not demand a postponement of the deduction. *United States* v. *White Dental Co.*, 274 U.S. at 403; *Scofield's Estate* v. *Commissioner, supra* at 159. The standard is to be applied by foresight, and hence, we do not look at facts whose existence and production for use in later proceedings was not reasonably foreseeable as of the close of the particular year. Nor does the fact of a future settle-

---

[11] In accord with this holding is *Rainbow Inn, Inc.* v. *Commissioner*, 433 F.2d 640, 642–643 (C.A. 3, 1970), reversing on another issue a Memorandum Opinion of this Court; cf. *Parmelee Transportation Co.* v. *United States*, 351 F.2d 619, 629 (Ct. Cl. 1965).

ment or favorable judicial action on the claim control our determination, if we find that as of the close of the particular year, no reasonable prospect of recovery existed. Cf. *Rainbow Inn, Inc.* v. *Commissioner*, 433 F. 2d 640, 644 (C.A. 3, 1970).

Petitioners argue that, in the instant case, an evaluation of their prospects of recovery should not be made under an objective standard whereby we make a finding as to the merits of claims for recovery which they may have against third parties. Without citing any substantive authority in support of their position, they urge that we adopt a standard under which, in effect, taxpayers who are told by their attorneys that claims against others will probably be unsuccessful, will be allowed to take a loss deduction, on the basis of such advice alone, in the year in which such advice is given. For a taxpayer in such a situation, according to petitioners, is acting under a reasonable subjective belief that his property has been irretrievably lost.

To adopt such a standard, however, would require us to ignore *Boehm* v. *Commissioner, supra*, a case in which the Supreme Court of the United States explicitly rejected any notion that a taxpayer's reasonable beliefs or attitude are, or should be, "sole" or even "controlling" criteria in determining the year in which a loss can be deducted. 326 U.S. at 292. The Supreme Court there went on to say : "a loss, to be deductible under section 23 (e), must have been sustained *in fact* during the taxable year." *Boehm* v. *Commissioner*, 326 U.S. at 292.

It is true that the Supreme Court, in *Boehm*, also indicated that one's attitude and conduct and other subjective factors "are not to be ignored" in determining loss deductibility—except that such factors may not be the sole or controlling criteria. 326 U.S. at 293. However, even assuming that in some cases more than minimal weight must be given to such factors, we cannot find in the instant case that petitioners' "beliefs" deserve very much attention. For while petitioners argue that in 1965 they thought they had little chance of recovering, their actions were those of parties gearing up for a contest as to their legal rights. In November, shortly after discovering the embezzlements, and after informing Equitable that they were investigating their rights as to the embezzled proceeds, petitioners retained Sykes, who immediately began a thorough study of the law in the area. Sykes, an attorney with extensive experience in long and complicated litigations, had been described to the Scarletts by their counsel as a man who could probably effect a recovery of the proceeds. Several months later, petitioners made a final decision to file suit, and within several months after that, copies of declarations in the proposed suit were delivered to Equitable. While petitioners argue that the decision to sue was first made in the spring of 1966, we can make no such finding. Whatever was their actual

state of mind prior to that, petitioners' actions indicated an intent to be prepared for any future legal struggle. In light of this circumstance, the standard for loss deductibility laid down in *Boehm* is most closely followed by our giving the most substantial weight to an evaluation of petitioners' prospects of recovery in such a struggle. Cf. *Rainbow Inn, Inc.* v. *Commissioner*, 433 F.2d at 643–644.[12]

## I. *Potential for Recoveries from Banks*

A. *Ramsay Scarlett.*—We first considered Ramsay's prospects of recovering from Equitable on the group I checks. As noted above, these were checks, drawn on Ramsay's agency account at Equitable, and made payable to Ramsay. All of these checks were endorsed by a stamp, "Ramsay Scarlett & Co., Inc., Agency Account Number 0571–168–0," with Raley's signature immediately thereunder. Of the entire amount embezzled from such checks, $184,500 was embezzled on checks drawn and paid after February 1, 1964, the date on which the Uniform Commercial Code became effective in Maryland. Md. Ann. Code art. 95B, sec. 10–101 (1957). (Hereinafter, all references to the Uniform Commercial Code, as enacted by the Maryland legislature, shall be in the form of "UCC," followed by the relevant section.) It is to this body of law that we look to determine how the respective rights of the parties as to the group I checks would probably have been analyzed by the Maryland courts.

Ramsay's basic claim against Equitable as to the group I checks was that Raley never had any authority to endorse them in the manner he did and that, hence, each of them was cashed on an unauthorized endorsement. Such an endorsement would not bind Ramsay on the instrument, UCC 3–404(1), and would require Equitable to recredit Ramsay's account for the full amount of the embezzled proceeds. UCC 4–401(1) and (2).

Whether and to what extent an individual is the agent of another person or entity are questions of fact. *Forest Hill Permanent Bldg. Assn.* v. *Fisher*, 140 Md. 666, 670, 118 Atl. 164, 166 (1922); *Heslop* v. *Dieudonne*, 209 Md. 201, 206, 120 A. 2d 669, 672 (1956). The burden of proof on such issues rests with the party attempting to establish the existence or scope of the agency, a relationship not to be lightly inferred.[13] *Forest Hill Permanent Bldg. Assn.* v. *Fisher*, 140 Md. at 670–

---

[12] The case would involve a significantly more difficult and perplexing question had petitioners, on advice of counsel, decided initially not to pursue legal action because of a determination of futility, and had then acted in accord with such decision. Weight has been given to a taxpayer's "reasonable beliefs" when his conduct is consistent. *Scofield's Estate* v. *Commissioner*, 266 F.2d 154, 160 (C.A. 6, 1959); *William E. Chandler*, T.C. Memo. 1972–193.

[13] Reliance on the alleged agent's declaration as to his authority is not enough to establish an agency in him. *Posko* v. *Climatic Control Corp.*, 198 Md. 578, 583, 84 A.2d 906, 909 (1951).

672, 118 Atl. at 166; *Brager* v. *Levy*, 122 Md. 554, 562, 90 Atl. 102, 105 (1914); UCC 3–307(1)(a). In the instant case, we think the bank would have had substantial difficulties establishing that Raley had express authority from Ramsay to endorse the checks as he did. There is no evidence that any of Ramsay's directors or officers ever told Raley he could endorse the checks as he did, or that Raley was unaware of Ramsay's prior practice of using group I checks only for the purpose of transferring funds from the agency to the regular account. The fact that petitioners did not introduce into the record any group I checks which had been properly used for intracompany transfers makes it impossible for us to determine the prior company practice in presenting such checks at Equitable. Hence, we cannot find that Ramsay had no reasonable prospect of recovery because of the defense of express authority.

We reach a similar conclusion as to Equitable's defense of implied authority in Raley. Implied authority—

may arise by implication from acts and conduct [by the principal] indicating an intent to create it, as well as from an express appointment, and, where it is thus created, the acts and conduct of the principal from which it is inferred need not necessarily be known to the person seeking to charge the principal, because, in such a case, the agency is one in fact, and not an agency by estoppel. * * * [*ABUC Trading & Sales Corporation* v. *Jennings*, 151 Md. 393, 410, 135 Atl. 166, 173 (1926).]

In the instant case, Raley was aware of the corporate resolution filed with Equitable which required that, in addition to his own signature, he obtain the signature of one of the officers of Ramsay named therein in order to draw funds on the company account. This two-signature requirement, we think, gave at least some notice to Raley that any endorsement of a corporate check, when the purpose of such endorsement was to effect a cashing of such check, should also contain a similar number of signatures.[14] Furthermore, while Lampe was aware that Raley owned an agency account stamp without a "for deposit" designation, it was the apparent understanding of Raley and Lampe that such stamp was to be used only to cash checks for vessel employees, which checks were never in excess of $100 in amount. Furthermore, the record does not establish that Raley's endorsement of the group I checks was "necessary to the performance of the duties actually conferred on [him], or was a customary incident of the agency conferred." *Atlantic Trust Co.* v. *Subscribers to Automobile Ins. Exch.*, 150 Md. 470, 474, 133 Atl. 319, 321 (1926).

The other type of authority which Equitable ascribes to Raley is

---

[14] Indeed, the fact that the endorsement of "negotiable paper belonging to the corporation" was mentioned in the authorization as requiring two signatures may, in itself, have constituted *express* notice that two signatures were required to endorse the group I checks. The parties, however, do not discuss this possibility.

apparent authority. The Maryland courts have described apparent authority as follows:

A principal may so characterize his agent, or permit such an extension of the agent's functions, as to lead third persons to assume reasonably that the agency was general, or covered the power in question * * *. But it is a representation or holding out by the principal that so extends the agency, not any mere combination of circumstances which may, without the principal's participation, mislead third persons, however reasonably, into a false inference of authority. It is the attitude of the principal which determines the question.* * * [*Atlantic Trust Co.* v. *Subscribers to Automobile Ins. Exch.*, 150 Md. at 475, 133 Atl. at 321; (to same effect see *Brager* v. *Levy*, 122 Md. at 560–561, 90 Atl. at 104–105; *McClure* v. *E. A. Blackshere Co.*, 231 F. Supp. 678, 685 (D. Md. 1964)).]

We think Equitable would have had considerable difficulty in establishing the existence of this type of authority in Raley.[15] Although there are no Maryland cases in point, those jurisdictions which have considered the issue have held that where a corporation has filed with a bank a certificate of authority (or by other method notified the bank) specifically instructing the bank only to recognize a specified signature, or number of signatures for the purpose of allowing a drawing on the corporate account, that such authorization or notice covers the type of endorsement to be made on checks made payable to the corporation when such endorsement is for cashing purposes.[16] *Graham* v. *Southington Bank & Trust Co.*, 99 Conn. 494, 496, 506, 121 Atl. 812, 816 (1923); *Weaver Construction Co.* v. *Farmers National Bank*, 253 Iowa 1280, 1285–1286, 115 N.W. 2d 804, 806 (1962); *Beacon Chocolate Co.* v. *Bank of Montreal*, 14 F.2d 599, 600–601 (C.A. 7, 1926), certiorari denied 273 U.S. 744 (1927); *Industrial Plumbing & H. S. Co.* v. *Carter County Bank*, 25 Tenn. App. 168, 173, 154 S.W. 2d 432, 435 (1941); *Passaic-Bergen Lumber Co.* v. *United States Trust Co.*, 110 N.J.L. 315, 317, 164 Atl. 580, 581 (1933). Ramsay sets forth no reasons why the Maryland courts would not adopt such a practical and reasonable rule, and no such reasons are apparent in the extensive case law we have examined. Thus, Equitable might be charged with notice—which would directly contradict the defense of apparent authority in Raley— that a proper corporate endorsement on checks to be cashed required the signature of one of the named officers in addition to Raley's. Cf.

[15] In the absence of apparent authority, the bank's liability has been explained as follows:

"However hard the burden of it may sometimes be for bankers, the general rule undoubtedly is that principals may rely upon bankers to avoid honoring indorsements by an agent to whom they have given not even apparent authority. * * * [*Atlantic Trust Co.* v. *Subscribers to Automobile Ins. Exch.*, 150 Md. 470, 477, 133 Atl. 319, 322 (1926).]"

[16] In *National Union Bank* v. *Miller Rubber Co.*, 148 Md. 449, 129 Atl. 688 (1925), the Maryland Court of Appeals dealt with a case where the plaintiff-corporation had filed with the bank extracts from its bylaws which indicated which corporate officers could draw funds from the bank. The court concluded that the bank "knew" that the endorsement of certain third parties was unauthorized, but did not indicate to what extent it assumed this knowledge on the basis of the corporate authorization. (148 Md. at 457–458, 129 Atl. at 691; see also *Slavin* v. *Passaic Nat. Bank & Trust Co.*, 114 N.J.L. 341, 176 Atl. 339 (1935)).

*Brager* v. *Levy*, 122 Md. at 561, 90 Atl. at 105; *Prince George's Country Club* v. *Edward R. Carr, Inc.*, 235 Md. 591, 609, 202 A. 2d 354, 363 (1964).

It is true that Raley did properly cash thousands of dollars worth of checks at Equitable, but those were checks made payable to Lampe or other employees individually and so endorsed. Ramsay had followed this practice for years in fulfilling its cash needs, and it is not to be easily assumed that the Maryland court would find that Raley's authority to cash such individually payable checks included an authority to cash checks made payable to the corporation. In addition, while only a few of the checks over the 1962 to 1965 period which were payable to individuals and cashed by Raley exceeded $10,000, the average face amount of the embezzled group I checks exceeded $20,000, and as mentioned above, such group I checks had in the past only been used to effect transfers between corporate bank accounts and not to obtain cash.

It is also true that Raley was allowed by Lampe to keep in his possession the stamp which he used to endorse the group I checks. Again, however, the checks which Lampe allowed Raley to endorse with such stamp were checks, made payable to individual vessel employees, which apparently never exceeded $100 in face amount. It cannot be said with any certainty that Raley's ability to cash these types of checks on his own signature and the stamp would have caused the Maryland court to find an apparent authority in Raley to cash the larger and different-in-form group I checks.

*Glens Falls Indemnity Co.* v. *Palmetto Bank*, 104 F. 2d 671 (C.A. 4, 1939), is distinguishable on its facts from the instant case. There, it was admitted at trial by the president of the plaintiff-corporation that the embezzling agent not only had complete control over company operations as a general agent, but also had the authority to endorse for cashing purposes by his own signature and a corporate stamp, checks payable to the corporation. On such an admission, the court had no difficulty finding that the agent had apparent and indeed express authority to cash the checks, the proceeds of which he embezzled. 104 F. 2d at 674.[17] In the instant case, Ramsay's officers explicitly denied that Raley had any such authority or that they were aware of any past practice of Raley's in so endorsing checks made payable to the corporation.

We are, of course, not suggesting that Equitable would have necessarily lost on any of the claims of authority discussed above. How-

---

[17] Furthermore, there was no two-signature requirement on the corporate authorization, and the embezzler was listed thereon as being authorized, on his signature alone, to transact business with the bank on behalf of the corporation. *Glens Falls Indemnity Co.* v. *Palmetto Bank*, 23 F. Supp. 844, 847 (W.D. S.C. 1938), aff'd. 104 F. 2d 671, 674–675 (C.A. 4, 1939).

ever, in light of the facts, we cannot find that such defenses were so cogent as to deprive Ramsay of a reasonable prospect of recovery as to the group I checks.

Other defenses which Equitable would probably have raised (and did in fact raise while the suit was pending) against Ramsay's claim as to the group I checks would have been based on UCC 4–406, 3–406, and 3–405. UCC 4–406(1) and (2) provide, in essence, that a bank shall not be liable for checks paid on unauthorized signatures if (1) the bank has made available to its customer, as with the monthly statement, those canceled checks as to which the customer now demands a recrediting and (2) the customer did not exercise reasonable care in examining the checks, discovering the unauthorized signatures, and notifying the bank. In the instant case, it is clear that the bank had a very strong argument that Ramsay was negligent in allowing Raley to both cosign checks and also reconcile the monthly bank statements. Equitable, however, under UCC 4–406(3) loses this defense, if Ramsay can establish a "lack of ordinary care on the part of the bank in paying the item." On the facts before us, we think Ramsay also had compelling arguments that Equitable was negligent in cashing the group I checks for Raley. As we have mentioned above, group I checks were never before cashed by employees of Ramsay, but had only been used for purposes of effecting transfers between the corporate bank accounts. We think it not unlikely that a court would have required Equitable to have consulted Ramsay officers before cashing such group I checks —at least the first time such a check was attempted to be cashed—especially in light of the large face amounts involved. Further, the checks on their face were somewhat irregular. While the checks were drawn on the agency account, and made payable to the corporation, the endorsement was by an agency account stamp, i.e., by a stamp of the drawn from, rather than the payee account. Whether such an endorsement effects the required negotiation, we think, is at least questionable. UCC 3–202(1). Thus, we cannot find that Ramsay was deprived of a reasonable prospect of recovery because of UCC 4–406.

There is a statute of limitations provision in UCC 4–406(4) which provides, in essence, that despite lack of due care in either party, a customer is precluded from attacking the bank's action if it has not informed the bank of unauthorized signatures within a year of receipt of the monthly statement, or of unauthorized endorsements within 3 years. While we think that, as a policy matter, there is a strong argument that the 1-year limitation should apply in the instant case because of Ramsay's presumed familiarity with its own endorsement on group I checks, such a position would require the court to substantially ignore

the express language of the provision which allows a 3-year limit on endorsements.[18] Again, Ramsay's prospects of recovery are not made unreasonable by the limitations provision.

Under UCC 3-406, one is precluded from raising the claim of unauthorized endorsement against a drawee bank if such bank can show that the claimant's own negligence substantially contributed to the making of the unauthorized endorsement. However, the bank must have paid such items in accordance "with reasonable commercial standards." For the reasons described above in our discussion of Equitable's defenses of Raley's apparent authority and UCC 4-406, we think Ramsay has a strong argument that the bank did not pay the group I checks in accord with such standard. Hence, we cannot find that UCC 3-406 deprived Ramsay of a reasonable prospect of recovery.

UCC 3-405(1) provides, in pertinent part, that "An indorsement by any person in the name of a named payee is effective if * * * (b) a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument; or (c) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest." Were Equitable to raise this defense, we think it would have substantial problems in that it is not clear that a court would find, as to the group I endorsements, that such were made in the "name of a named payee." While there is no Maryland case in point on this question, the corporate resolution on file at Equitable very · arguably gave the bank notice that any corporate signature for purposes of bank transactions required the signatures of two of the individuals named thereon, including a signature of one of the named officers. Thus, to have a "regular chain of endorsements" on the checks, two such signatures might very well have been required. Furthermore, while there is again no case law in point under the UCC, it has been suggested by commentators that the bank's negligence might preclude it from raising a defense under UCC 3-405. White & Summers, Uniform Commercial Code, pp. 548-549 (1972). The suggestion is that while UCC 3-405 makes the bank a holder, by rendering the endorsement valid for purposes of negotiation, it does not necessarily give the bankholder in due course status under UCC 3-302 (see UCC 3-304(1) and (2)), and, hence, the negligent bank remains subject to the corporation's defenses. UCC 3-306.

As we have noted above, there are clearly litigable issues as to whether or not Equitable was negligent in cashing the checks. While we cannot lightly dismiss the potential of Equitable's UCC 3-405

---

[18] UCC 3-402 would seem to require that the Court treat Ramsay's endorsement as an endorsement for purposes of the limitations provision: "Unless the instrument clearly indicates that a signature is made in some other capacity it is an indorsement."

defense, we cannot find that such defense deprived Ramsay of a reasonable prospect of recovery. Thus, we find that Ramsay had a reasonable prospect of recovery as to the $184,500 in proceeds embezzled from group I checks which were drawn and paid after February 1, 1964.

As to the $48,200 in proceeds embezzled from group I checks which were drawn and paid prior to February 1, 1964, the rights of Ramsay and the bank are controlled by the old Uniform Negotiable Instruments Law (NIL) as enacted by the Maryland legislature. Md. Ann. Code art. 13, secs. 15–211 (1957) (repealed as to all relevant provisions by the UCC). Neither respondent nor Ramsay has shown that any claims or defenses different from those considered above existed for either Ramsay or Equitable under the NIL, and we find none to have existed. See Md. Ann. Code art. 13, secs. 40, 44, 73, 76 (1957). *Union Trust Co.* v. *Soble*, 194 Md. 427, 430–431, 64 A. 2d 744, 746 (1949), only holds that a customer has a duty to examine his monthly statements, a duty now posited in UCC 4–406(1) and (2), and that his failure to do so estops him from raising the defense of forged or unauthorized signatures against the bank. No apparent claim was made in that case that the bank was negligent in paying the items, a claim which we have found is a strong one in the instant case. Thus, we think our finding that Ramsay had a reasonable prospect of recovery as to those checks governed by the UCC, necessarily leads us to find similarly as to those checks covered by prior law.

We next consider Ramsay's prospects for recovery from Equitable as to the group II checks. Such checks, as noted above, were drawn on the agency account and made payable to Equitable. From group II checks drawn and paid after February 1, 1964, $714,000 was embezzled. As assumed by the parties, the UCC is itself silent as to Ramsay's rights of recovery against Equitable on this type of check. In this situation, we must look instead, as did the parties in their respective briefs and as the UCC allows (UCC 1–103) to the old law merchant.

While there is no Maryland case law on the subject, it has been the rule in jurisdictions which have considered the issue that a bank cashing checks, payable to itself, for the agent of a corporate depositor, does so at its peril. For the bank to be successful in defending an action by the company for a recrediting of such funds when embezzled, the bank must establish that the agent had actual or apparent authority to cash such checks. *Main Belting Co.* v. *Corn Exchange Nat. Bank & T. Co.*, 325 Pa. 168, 173–174, 188 Atl. 865, 868–869 (1937); *New Jersey Nat. Bank & Trust Co.* v. *Sachs*, 91 F. 2d 533, 534 (C.A. 3, 1937); *Matteawan Mfg. Co.* v. *Chemical Bank & T. Co.*, 244 App. Div. 404, 412, 416, 279 N.Y.S. 495, 504 (1st Dept. 1935); *Pacific Indemnity*

*Co.* v. *Security First National Bank,* 248 Cal. App. 2d 75, 93–94, 56 Cal. Rptr. 142, 152–154 (2d Dist. Ct. App. 1967). See cases collected at 138 A.L.R. 853 (1942). The issue thus, as to the group II checks, would be whether Raley had actual or apparent authority to cash such checks for Ramsay. Because we think that Equitable would have had substantial difficulties in establishing such authority, we find that Ramsay had a reasonable prospect of recovery as to the group II checks drawn and paid after February 1, 1964.

Prior to the period during which the embezzlements occurred, no group II type checks had ever apparently been cashed at Equitable by Ramsay employees. Rather, such checks had been used for two purposes: (1) To direct Equitable to wire funds to principals for whom Ramsay worked, or to have the bank write a check for Ramsay on New York banks for payments to principals (such transactions did not require or cause any cash to come into the hands of Ramsay agents); (2) to provide cash for Brinks' agents who would deliver it to shipmasters as directed by Ramsay. When a group II check was brought to Equitable for this latter purpose, there would almost always be a notation on the face of such check that it was to be used to provide funds for a Brinks' delivery to a certain named vessel. Such check would also always be accompanied by a letter from Ramsay, in which Equitable was instructed to hand over the proceeds from the check to the Brinks' agent for delivery to a named vessel. Also included were certain receipt forms which Equitable was to give to Brinks along with the proceeds, and which Brinks was to return, with proper notation, after completion of delivery to the vessel. The teller would personally hand over the funds and receipts to the Brinks' representative, usually at a special window in the bank. In light of such precautions, we think it certainly not improbable that the Maryland courts would have put a duty on the bank to have inquired further when Raley, without any of the accompanying letters or receipts, presented for cashing group II checks in such substantial face amounts.

It is true that during and just before the period of the embezzlements, a very few of such group II checks, in face amounts of $3,000, $4,000, and $5,000, were cashed by Raley, and the proceeds properly placed by him in the corporate cash box. However, it seems clear that Raley was doing this as a kind of "feeler," to determine if by this method he could successfully gain access to substantial amounts of corporate funds. We did not think that the mere fact of such cashings would have been deemed to have justified Equitable in believing that Raley was authorized to cash such checks, for Raley did not clearly have authority to cash them whatever use he made of the proceeds.

It is also true that Raley cashed substantial numbers of checks made payable to individuals, usually Lampe, with Lampe's or the

other individual payee's endorsement thereon. However, as we have noted previously, we do not think that the authority to cash such checks precludes the existence of a reasonable prospect that the Maryland courts would still find a lack of authority to cash the different-in-form group II checks. Furthermore, while the checks payable to individuals only rarely exceeded $10,000 in face amount, the group II checks averaged over $30,000 in face amount. We think it not so unlikely that the courts would have found, in light of the large face amounts involved, that Equitable should have been considerably more careful in cashing such checks.

Ramsay has set forth no reasons why the Maryland courts would not conform to the apparently unanimous rule governing checks payable to banks, which we described above, and we have found no such reasons in our examination of related Maryland case law. *Union Trust Co.* v. *Soble, supra*, does not call for a different conclusion. The basis of that decision was that customers who examine items paid by their bank are familiar enough with their own signatures that they will recognize a forgery or unauthorized signature. In the instant case, the group II checks were entirely proper in form, without any forged or unauthorized endorsements. Thus, there would not have been the same notice of wrongdoing to Ramsay from the face of the check itself, as exists in cases where a signature is improper. UCC 4-406, which appears to codify the *Union Trust* case in Maryland, again places a duty on the customer only in cases of forged or unauthorized signatures and endorsements, and altered items. UCC 4-406(1) and (2). Thus, we find that Ramsay had a reasonable prospect of recovering the proceeds embezzled from group II checks drawn and paid after February 1, 1964.

The analysis presented above would be the same as to the $23,000 embezzled from group II checks drawn and paid under the old NIL. Hence, we find that Ramsay had a reasonable prospect of recovering this amount as well.

As to the $35,100 which Raley embezzled on checks payable to himself, it is clear that he had the authority to cash this type of check. Hence, we find that Ramsay had no reasonable prospect of recovering the proceeds from these checks. Similarly, we find no reasonable prospect of recovery on the checks in the total face amount of $77,000, which Ramsay was unable to find—they having been apparently destroyed by Raley. Further, it is highly improbable that Ramsay would have recovered the $11,000 which Raley stole from Ramsay's cashbox, without any participation by Equitable.

Finally, we consider the check payable to Lampe which Raley, after procuring Lampe's endorsement, raised in face amount from $4,000 to

$34,000. For the bank to have successfully defended an action by Ramsay to recover the $30,000 "raising," it would have had to show that Ramsay's negligence in drawing the instrument substantially contributed to the alteration. UCC 3-406. Since we have no copy of the check before us, nor any helpful testimony, we cannot determine the bank's chances of success on this item. Thus, since Ramsay has not carried its burden of proof as to this item, we uphold respondent's determination that Ramsay had a reasonable prospect of recovering the amount in which the check was raised.

In conclusion, we find that Ramsay had a reasonable prospect of recovering the following amounts from Equitable:

| | |
|---|---:|
| Group I check proceeds | $232, 700 |
| Group II check proceeds | 737, 000 |
| "Raised" check | 30, 000 |
| Total as to which reasonable prospect existed | 999, 700 |

B. *Baltimore Stevedoring.*—As to Stevedoring's chances of recovery, we consider first the group III checks. These were checks drawn by Stevedoring, made payable to Ramsay, and cashed at Equitable on an endorsement consisting of Raleys' signature and the agency account stamp. The UCC is relevant to $375,000 of the proceeds embezzled from such checks.

The threshold issue as to the group III checks is whether, under the UCC, a drawer, such as Stevedoring, can maintain an action directly against the collecting or depositary bank, UCC 4-105(a) and (d), which Equitable was as to these checks. At least one court has held that such an action is not maintainable under the presentment warranties section in the Code, UCC 3-417(1). *Stone & Webster Eng. Corp.* v. *First National B. & T. Co.*, 345 Mass. 1, 8-10, 184 N.E. 2d 358, 363 (1962) ; 99 A.L.R. 2d 628 (1935). Under this section the collecting bank warrants to later transferors who "pay[s] or accept[s]" that any endorsement on the check is neither forged nor unauthorized. UCC 3-417(1) (a). It was the holding of the Massachusetts court in *Stone & Webster*, that the drawer was not one who "pays or accepts," and hence, that a party such as Stevedoring could not maintain a breach of warranty action against one in Equitable's position. A later California case has rejected this position, but would allow the collecting bank to assert any defenses which the drawee bank would have had against the drawer. *Allied Concord F. Corp.* v. *Bank of Amer. Nat. T. & S. Assn.*, 275 Cal. App. 2d 1, 7, 80 Cal. Rptr. 622, 625 (2d Dist. Ct. App. 1969). The Maryland courts have not dealt with this issue, although in a case under the old Bank Collection Code, Md. Ann. Code art. 11, secs. 133, 134 (1957), the Court of Appeals did hold that a guaranty of prior endorsements to subsequent "payors" did not give

rise to an action by a drawer. *Levin* v. *Union National Bank of Westminster*, 224 Md. 603, 606–607, 168 A. 2d 889, 891 (1961).

It is recognized by implication, however, in the UCC, that other types of actions may be brought against a collecting or depositary bank:

Subject to the provisions of this article concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable *in conversion or otherwise* to the true owner beyond the amount of any proceeds remaining in his hands. [UCC 3–419(3), emphasis supplied.]

Because the Code is silent as to which other types of actions are maintainable against a collecting bank, we think it very likely that the Maryland courts—as did the Massachusetts court in *Stone & Webster* [19]—would again look to prior law, to the extent the Code has not explicitly repudiated it. UCC 1–103.

Looking to such prior "law merchant," we find that the Maryland courts have allowed drawers to successfully sue collecting banks for cashing checks on unauthorized endorsements, under a constructive trust theory. *John Hancock M. L. Ins. Co.* v. *Fidelity-Baltimore, etc.*, 212 Md. 506, 514–515, 129 A. 2d 815, 821 (1957); *Fidelity-Baltimore Co.* v. *John Hancock Co.*, 217 Md. 367, 371, 142 A. 2d 796, 797–798 (1958); cf. *National Union Bank* v. *Miller Rubber Co.*, 148 Md. 449, 455–456, 129 Atl. 688, 690 (1925); *Levin* v. *Union National Bank of Westminster*, 224 Md. at 607, 168 A. 2d at 891 (1961). The policy underlying such action seems to be that the first entity which cashes a check on an unauthorized endorsement should bear the loss, unless it is able to set up one of the defenses which we have considered in evaluating the group I check issue. By allowing such an action, the court prevents a collecting bank, which is not operating with due care and in accord with reasonable commercial principles, from assuming the defenses of a later drawee bank, against the drawer, when such drawee bank itself operated properly. The Maryland courts had no conceptual difficulty in applying the constructive trust concept, which had before been utilized to allow payees to sue collecting banks, *National Union Bank* v. *Miller Rubber Co.*, 148 Md. at 455–456, 129 Atl. at 690, to actions by drawers against such banks. *Fidelity-Baltimore Co.* v. *John Hancock Co.*, 217 Md. at 371, 142 A. 2d at 797–798. Because of the apparent invitation in the Code to utilize other types of actions against collecting banks and because the Maryland courts in the past have not been reluctant in doing so, we think there was a reasonable

---

[19] The Massachusetts court looked at the possibility of actions under prior law as potential alternatives to an action under the presentment warranties sections. 345 Mass. at 6–7, 184 N.E. 2d at 361–362.

prospect that Stevedoring would have been allowed to sue Equitable under the theory of constructive trust.

Having so found on the issue of whether an action would lie, we think an analysis of the likely results of such an action must follow the analysis we applied above to the group I checks. Here Stevedoring would be setting forth the lack of authority argument, with Equitable again attempting to counter with defenses under UCC 3–405 and 3–406.[20] As in the action on the group I checks, we would find very relevant Equitable's possession of Ramsay's certificate of authority on the general account, and also the fact that group III checks had never before, until Raley's escapades, been utilized for any other purposes than to effect transfers between Ramsay and Stevedoring bank accounts.

Having dealt with the matter fully above, as to the group I checks, we find similarly here, that the drawer, here Stevedoring, had a reasonable prospect of recovering those proceeds from group III checks drawn and paid after February 1, 1964.

Because we have looked to pre-UCC law in deciding the issue as to the group III checks described above, we also find, necessarily, that Stevedoring had a reasonable prospect of recovering those proceeds— $25,500 in amount—embezzled from checks drawn and paid prior to February 1, 1964.

Finally, we consider the group IV checks, $28,000 of the proceeds of which were embezzled, all from checks drawn on Stevedoring's account with Mercantile and made payable to Equitable and not endorsed. These were all paid subsequent to February 1, 1964. We have found above that there is a reasonable prospect that a Maryland court would allow a drawer to sue a collecting bank. We have also found a reasonable prospect that Maryland would adopt the apparent majority rule as to checks made payable to banks. That majority rule would also hold a collecting-payee bank liable for checks drawn on another bank, in the absence of a demonstration of authority in the agent cashing such checks. *Graham* v. *Southington Bank & Trust Co.*, 99 Conn. at 503–504, 121 Atl. at 815 (1923) ; *Main Belting Co.* v. *Corn Exchange Nat. Bank & T. Co.*, 325 Pa. at 173–174, 188 Atl. at 868–869; *W. L. Chase* v. *Norfolk Nat. Bank of C. & T.*, 151 Va. 1040, 1051–1052, 145 S.E. 725, 730 (1928). See cases collected in 82 A.L.R. 1372 (1933).

Group IV type checks, prior to the embezzlements, had never before been cashed by agents of Stevedoring. For reasons analogous to those presented above in our discussion of the group II checks, we think Raley's authority to cash such checks was highly doubtful. Thus, we find that Stevedoring had here a reasonable prospect of recovery as to the group IV checks.

---

[20] Because this action is not based on breach of warranty, Equitable would not likely be able to utilize Mercantile's UCC 4–406 defenses, which prescribe only the duties of a customer to his drawee bank. Stevedoring is not such a customer as to Equitable.

Because we have found that Stevedoring had a reasonable prospect of recovering at least $418,730 from Equitable, which is the amount of Stevedoring's claimed loss, we need not consider Stevedoring's chances of recovery against other parties, including Mercantile, in order to sustain, in full, respondent's disallowance of any loss deduction to Stevedoring in 1965.[21]

## II. *Potential for Ramsay Recoveries From Other Parties*

Respondent has not contended that Ramsay had a reasonable prospect of recovering anything from Raley himself. Raley and his wife did own certain shares of stock, but due, undoubtedly, to the imminence of the Federal tax lien against them, respondent has not argued that Ramsay might have gained a satisfaction from this source. We find on the facts that there was no reasonable prospect of recovery from Raley.

Respondent has contended, though without giving any reasons in support, that Ramsay had a reasonable prospect of recovering from Wooden & Benson. We must disagree. In the first place, the accountants advised Ramsay officers on a number of occasions that they should be allowed to make a fuller and more probing audit of Ramsay's books. Such advice was consistently rejected, however, and Wooden & Benson's functions continued to be limited, for the most part, to the preparation of Ramsay's income tax returns. Ramsay officers expressed continued contentment with a system of fiscal control which placed major responsibility for reconciling bank statements and posting and checking accounts receivable on Ramsay employees. And, finally, the officer in charge of Ramsay's finances and accounting was Lampe, a former employee of Wooden & Benson, who was undoubtedly familiar with the scope of the "partial audit" which Wooden was performing for Ramsay. On these facts, we find that Ramsay did not have a reasonable prospect of recovering from its accountants.

Since we have found that Ramsay had no reasonable prospect of recovering additional amounts from either Raley or Wooden & Benson, we hold that Ramsay is entitled in 1965 to a theft loss deduction of $48,849, which is the amount by which the total loss claimed on its return exceeds the sum which we have found it had a reasonable prospect of recovering from Equitable.

> *Decision will be entered under Rule 155 in docket No. 3433-70.*
>
> *Decision will be entered for the respondent in docket No. 3434-70.*

---

[21] Recently, in *Taylor v. Equitable Trust Co.*, 269 Md. 149, 304 A. 2d 838 (1973), the Maryland Court of Appeals gave indications that it would follow a number of the theories of bank liability discussed above.